## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| **KAREN BELLIFEMINE, AMY ZEOLI, MICHELLE POPA, and SUE SULLIVAN,** | ) )  )  ) | **CLASS ACTION COMPLAINT** |
| **Individually and on Behalf of Others Similarly Situated,** | )  ) ) | **Case No. 1:07-CV-02207-JGK** |
| **PLAINTIFF,** | ) ) ) | |
| **v.** | ) ) | **JURY TRIAL DEMANDED** |
| **SANOFI-AVENTIS U.S. LLC and SANOFI-AVENTIS,** | ) ) ) ) ) | |
| **DEFENDANTS.** | | |

## FIRST AMENDED CLASS ACTION COMPLAINT

## I.    NATURE OF THIS ACTION

1.      Karen Bellifemine, Amy Zeoli, Michelle Popa, and Sue Sullivan (collectively "Plaintiffs" or "Class Representatives") bring this action against their current or former employers, Sanofi-Aventis U.S. LLC and Sanofi-Aventis (collectively "Sanofi-Aventis" or "Defendants") to redress gender discrimination in employment.  Plaintiffs bring this class action on behalf of themselves and all other female employees of Sanofi-Aventis who are similarly situated pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e), *et seq*., as amended ("Title VII").

2.      Plaintiffs seek to represent female employees of Sanofi-Aventis who have been subjected to one or more aspects of the systemic gender discrimination described in this Complaint, including, but not limited to: (a) discriminatory policies, practices, and/or procedures

in selection, promotion and advancement; (b) disparate pay; (c) differential treatment; (d) gender hostility; (e) hostile work environment; and (f) retaliation in the workplace.  The systemic gender discrimination described in this Complaint is continuing in nature.

3.     Plaintiffs are seeking, on behalf of themselves and the class they seek to represent, declaratory and injunctive relief; back pay; front pay; compensatory, nominal, and punitive damages; and attorneys' fees, costs, and expenses to redress Sanofi-Aventis's pervasive and discriminatory employment policies, practices and/or procedures.

## II.     JURISDICTION AND VENUE

4.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because the action is based on Title VII, which is a federal statute.

5.     Venue is proper in the Southern District of New York pursuant to 28 U.S.C. §§ 1391(b)(1) and 1391(c), because Defendants are subject to personal jurisdiction in New York.

6.     The Southern District of New York is the most logical forum in which to litigate the claims of Plaintiffs and the proposed class in this case.  Sanofi-Aventis has both a physical presence and a Registered Agent in the State of New York.  Further, Plaintiffs Bellifemine and Sullivan reside and have performed work for Defendants in the State of New York.

## III.     PROCEDURAL HISTORY

7.     Plaintiff Bellifemine filed a Class-wide Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on or about March 8, 2006.  Ms. Bellifemine received her Notice of Right to Sue on December 22, 2006, and timely filed suit within ninety (90) days of receipt, on March 14, 2007.

IV.     **PARTIES**

    A.     **Plaintiffs**

8.     **Plaintiff Karen Bellifemine** is a female citizen of the United States and a resident of Nanuet in the State of New York.  Ms. Bellifemine has been employed by Sanofi-Aventis from approximately July 1995 to the present in Sanofi-Aventis's New York and New Jersey territories.  Throughout that time, Ms. Bellifemine has worked as a Primary Care Sales Representative, a Hospital Representative, and a Senior Cardiovascular Specialty Sales Representative.  Ms. Bellifemine went on medical leave in approximately March 2006 and returned to her Senior Cardiovascular Specialty Sales Representative position in January 2007.

9.     **Plaintiff Amy Zeoli** is a female citizen of the United States and a resident of Cheshire in the State of Connecticut.  Ms. Zeoli was employed by Sanofi-Aventis from approximately early 2001 through approximately March 2006 as a Sales Representative, a Senior Sales Representative and a Territory Manager, Cardiovascular Specialty Sales in Sanofi-Aventis's Connecticut territory.  Ms. Zeoli held her Senior Sales Representative position until her constructive discharge in approximately March 2006.

10.     **Plaintiff Michelle Popa** is a female citizen of the United States and a resident of Noblesville in the State of Indiana.  Ms. Popa began her employment with Sanofi-Aventis in approximately November 2003 as a Sales Representative in Sanofi-Aventis's East Fort Lauderdale territory.  Ms. Popa continued to work in this capacity until she was constructively discharged in approximately January 2007.

11.     **Plaintiff Sue Sullivan** is a female citizen of the United States and a resident of Port Washington in the State of New York.  Ms. Sullivan began her employment with Sanofi-Aventis in approximately October 2002 as a Medical Center Specialist in Sanofi-Aventis's Long

Island territory.  In 2004, Ms. Sullivan became a Senior Hospital Account Specialist and in 2005 Ms. Sullivan became a Specialty Representative, a position she continued to hold until she was constructively discharged in approximately July 2006.

**B.     Defendants**

12.     **Defendant Sanofi-Aventis** is a French company created in 2004 by the merger of the French companies Sanofi-Synthelabo and Aventis.  Sanofi-Aventis is a world leader in the research and development of health care products.  Sanofi-Aventis's core business is in pharmaceuticals, specifically the prescription market.  Sanofi-Aventis is incorporated in the State of Delaware and physically located at 55 Corporate Drive, Bridgewater, New Jersey.  Sanofi-Aventis has a Registered Agent in the State of New York.

13.     **Defendant Sanofi-Aventis U.S. LLC** is an affiliate of, and the United States headquarters for, Sanofi-Aventis.  Sanofi-Aventis U.S. LLC is incorporated in the State of Delaware and physically located at 55 Corporate Drive, Bridgewater, New Jersey.

**V.     CLASS CLAIMS**

14.     Plaintiffs and the proposed class they seek to represent have been subjected to a systemic pattern and practice of gender discrimination involving a battery of practices that have also had an unlawful disparate impact on them and their employment opportunities.  This gender discrimination includes policies and/or practices of restricting the promotion and advancement opportunities of female employees so that they remain in lower classification and compensation levels.  Sanofi-Aventis in effect bars females from better and higher-paying positions which have traditionally been held by male employees.  The systemic means of accomplishing such gender stratification include, but are not limited to, Sanofi-Aventis's promotion, advancement, training and performance evaluation policies, practices, and/or procedures.

15.     Sanofi-Aventis's promotion, advancement, training, and performance evaluation policies, practices, and/or procedures incorporate the following discriminatory practices: (a) relying upon subjective selection methods, judgments, procedures, and criteria which allow for gender discrimination in making promotion, training, performance evaluation, and compensation decisions; and (b) refusing or failing to establish and/or follow policies, practices, procedures, or criteria that reduce or eliminate disparate impact and/or intentional gender bias.

16.     Sanofi-Aventis's promotion policies, practices, and/or procedures have had a disparate impact on female employees.  Such policies, practices, and/or procedures are not valid, job-related, or justified by business necessity.  There are alternative objective and more valid selection procedures available to the Defendants that are more closely related to the actual responsibilities of the positions and that would have less of a disparate impact on females.  However, the Defendants have failed or refused to use such alternative procedures.

17.     The Defendants' promotion, training, performance evaluation, compensation, and transfer policies, practices, and/or procedures are intended to have a disparate impact on Plaintiffs and the class they seek to represent.  Such practices form a part of the Defendants' overall pattern and practice of keeping females in the lower classifications with less desirable terms and conditions of employment.

18.     Because of the Defendants' systemic pattern and practice of gender discrimination, Plaintiffs and the class they seek to represent have been adversely affected and have experienced harm, including loss of compensation, wages, back pay, and employment benefits.  This pattern and practice of gender discrimination includes: being denied promotions in favor of equally or less qualified male employees; receiving lower performance appraisals for

performing the same work at the same level as male employees; and being disciplined more frequently and more severely than male employees.

19.     Plaintiffs and the class they seek to represent have been subjected to gender hostility at work, both severe and pervasive, which affects the terms and conditions of their employment.   The Defendants' actions and inactions encourage this behavior by its male employees.

20.     Plaintiffs and class members have no plain, adequate, or complete remedy at law to redress the rampant and pervasive wrongs alleged herein; this suit is their only means of securing adequate relief.  Plaintiffs and class members are now suffering irreparable injury from Sanofi-Aventis's unlawful policies, practices, and/or procedures as set forth herein, and will continue to suffer unless those policies, practices, and/or procedures are enjoined by this Court.

## VI.     CLASS ACTION ALLEGATIONS

### A.     Class Definition

21.     Plaintiffs seek to maintain claims on their own behalf and on behalf of a class of current and former Sanofi-Aventis employees.  Plaintiffs are members of the class.

22.     The class consists of all female citizens of the United States who are, or have been, employed by Sanofi-Aventis in the United States at any time during the applicable liability period.  Upon information and belief, there are hundreds, if not thousands, of members of the proposed class.

### B.     Efficiency of Class Prosecution of Common Claim

23.     Certification of a class of female employees similarly situated to Plaintiffs is the most efficient and economical means of resolving the questions of law and fact which are common to the claims of Plaintiffs and the proposed class.  Plaintiffs' individual claims require

resolution of the question of whether Sanofi-Aventis has engaged in a systemic pattern and/or practice of gender discrimination against female employees. Plaintiffs seek remedies to eliminate the adverse effects of such discrimination in their own lives, careers, and working conditions, and in the lives, careers, and working conditions of the proposed class members, as well as to prevent continued gender discrimination in the future. Plaintiffs have standing to seek such relief because of the adverse effect that such discrimination has had on them individually and on females generally. In order to gain relief for themselves, as well as for the proposed class members, Plaintiffs will first establish the existence of systemic gender discrimination. Without class certification, the same evidence and issues would be subject to re-litigation in a multitude of individual lawsuits with an attendant risk of inconsistent adjudications and conflicting obligations. Certification of the proposed class of females who have been affected by these common questions of law and fact is the most efficient and judicious means of presenting the evidence and arguments necessary to resolve such questions for Plaintiffs, the proposed class and Sanofi-Aventis.

24.     Plaintiffs' individual and class claims are premised upon the traditional bifurcated method of proof and trial for disparate impact and systemic disparate treatment claims of the type at issue in this case. Such a bifurcated method of proof and trial is the most efficient method of resolving such common issues.

### C.      Numerosity and Impracticability of Joinder

25.     The class that Plaintiffs seek to represent is too numerous to make joinder practicable. The proposed class consists of hundreds, if not thousands, of current, former, and future female employees during the liability period.

### D.       Common Questions of Law and Fact

26.     The prosecution of Plaintiffs' claims will require the adjudication of numerous questions of law and fact common to both her individual claims and those of the proposed class. The common questions of law include, *inter alia*: (a) whether Sanofi-Aventis has engaged in unlawful, systemic gender discrimination in its compensation, selection, promotion, advancement, transfer, training, and discipline policies, practices, and/or procedures, and in the general terms and conditions of work and employment; and (b) whether Sanofi-Aventis is liable for a continuing systemic violation of Title VII.

27.     The common questions of fact would include, *inter alia*: whether, through its policies, practices and/or procedures: (a) Sanofi-Aventis has denied or delayed the promotion of females; (b) Sanofi-Aventis has precluded females from eligibility for promotions by denying them training that male employees are afforded; (c) Sanofi-Aventis has paid females less than comparable male employees; and (d) Sanofi-Aventis has engaged in a pattern and practice of failing to take prompt and effective action to remedy the gender discrimination in its workplace.

28.     The employment policies, practices, and/or procedures to which Plaintiffs and the proposed class are or have been subjected are set at Sanofi-Aventis's corporate level and apply universally to all class members throughout the country.  These employment policies, practices, and/or procedures are not unique or limited to any department; rather, they apply to all departments, and, thus, affect Plaintiffs and proposed class members no matter the district, division, or position in which they work.

29.     Discrimination in selection, promotion and advancement occurs as a pattern and practice throughout all levels and all divisions of Sanofi-Aventis.  Selection, promotion, and advancement opportunities are driven by personal familiarity, subjective decision-making, pre-

selection, and interaction between male managers, supervisors, and subordinates rather than by merit or equality of opportunity.  As a result, male employees have advanced and continue to advance more rapidly to better and higher paying jobs than female employees.

30.     Sanofi-Aventis's policies, practices, and/or procedures have had an adverse impact on females seeking selection for, or advancement to, better and higher paying positions.

**E.    Typicality of Claims and Relief Sought**

31.     Plaintiffs' claims are typical of the claims of the proposed class.  Plaintiffs assert claims in each of the categories of claims they assert on behalf of the proposed class.  The relief sought by Plaintiffs for gender discrimination complained of herein is also typical of the relief which is sought on behalf of the proposed class.

32.     Plaintiffs, like the members of the proposed class, are female employees who have worked for the Defendants during the liability period.

33.     Discrimination in selection, promotion, advancement, and training affects the Plaintiffs and the proposed class members in similar ways.

34.     Differential treatment between male and female employees occurs as a pattern and practice throughout all levels and departments of Sanofi-Aventis.  Sanofi-Aventis's predominantly male managers hold female employees, including both Plaintiffs and class members, to stricter standards than male employees, and thus female employees often receive lower performance appraisals than do males for performing at the same level.  Female employees are also disciplined, formally and informally, more frequently and severely than their male counterparts.

35.     Plaintiffs and other female employees have complained to Sanofi-Aventis's management and Human Resources about gender discrimination and a sexually hostile work

environment.  Company investigations into these complaints have been inadequate and/or superficial.  Plaintiffs and the class members have been affected in the same ways by Sanofi-Aventis's failure to implement adequate procedures to detect, monitor, and correct this pattern and practice of discrimination.

36.    Sanofi-Aventis has failed to create adequate incentives for its managers to comply with equal employment opportunity laws regarding each of the employment policies, practices, and/or procedures referenced in this Complaint, and has failed to adequately discipline its managers and other employees when they violate the anti-discrimination laws.  These failures have affected Plaintiffs and the class members in similar ways.

37.    The relief necessary to remedy the claims of Plaintiffs is exactly the same as that necessary to remedy the claims of the proposed class in this case.  Plaintiffs seek the following relief for their individual claims and for those of the members of the proposed class: (a) a declaratory judgment that Sanofi-Aventis has engaged in systemic gender discrimination against female employees by limiting their ability to be promoted to better and higher paying positions, limiting their employment opportunities to lower and less desirable classifications, limiting their training and transfer opportunities, exposing them to differential treatment, subjecting them to gender hostility at work, subjecting them to sexual harassment and a sexually hostile work environment, and retaliating against them for complaining about the gender discrimination to which they are subjected; (b) a permanent injunction against such continuing discriminatory conduct; (c) injunctive relief which effects a restructuring of Sanofi-Aventis's promotion, transfer, training, performance evaluation, compensation, work environment, and discipline policies, practices, and/or procedures so that females will be able to compete fairly in the future for promotions, transfers, and assignments to better and higher paying classifications with terms

and conditions of employment traditionally enjoyed by male employees; (d) equitable relief which effects a restructuring of the Sanofi-Aventis workforce so that females are promoted into higher and better paying classifications than they would have held in the absence of Sanofi-Aventis's past gender discrimination; (e) back pay, front pay, and other equitable remedies necessary to make female employees whole from Defendants' past discrimination; (f) compensatory damages; (g) punitive and nominal damages to prevent and deter Sanofi-Aventis from engaging in similar discriminatory practices in the future; and (h) attorneys' fees, costs, and expenses.

### F.    Adequacy of Representation

38.    Plaintiffs' interests are co-extensive with those of the members of the proposed class that they seek to represent in this case.  Plaintiffs seek to remedy Sanofi-Aventis's discriminatory employment policies, practices, and/or procedures so that females will no longer be prevented from advancing into higher paying and more desirable positions, will not receive disparate pay and differential treatment, will not be subjected to gender hostility and sexual harassment at work, and will not be retaliated against for speaking out against gender discrimination and harassment.  Plaintiffs are willing and able to represent the proposed class fairly and vigorously as they pursue their individual claims in this action.  Plaintiffs have retained counsel who are qualified, experienced and able to conduct this litigation, and to meet the time and fiscal demands required to litigate an employment discrimination class action of this size and complexity.  The combined interests, experience and resources of Plaintiffs and their counsel to litigate competently the individual and class claims at issue in this case clearly satisfy the adequacy of representation requirement of Fed.R.Civ.P. 23(a)(4).

G.      **Requirements of Rule 23(b)(2)**

39.     Sanofi-Aventis has acted on grounds generally applicable to Plaintiffs and the proposed class by adopting and following systemic policies, practices, and/or procedures that are discriminatory on the basis of gender.   Gender discrimination is Sanofi-Aventis's standard operating procedure rather than a sporadic occurrence.   Sanofi-Aventis has refused to act on grounds generally applicable to the class by, *inter alia*, refusing to adopt and apply selection, promotion, training, performance evaluation, compensation, and discipline policies, practices, and/or procedures that do not have a disparate impact on, or otherwise systemically discriminate against, female employees.   Sanofi-Aventis's systemic discrimination and refusal to act on grounds that are not discriminatory have made appropriate the requested final injunctive and declaratory relief with respect to the class as a whole.

40.     Injunctive and declaratory relief are the predominant relief sought in this case because they are the culmination of the proof of Sanofi-Aventis's individual and class-wide liability at the end of Stage I of a bifurcated trial. In addition, injunctive and declaratory relief are the essential predicate for Plaintiffs' and class members' entitlement to monetary and non-monetary remedies at Stage II of such trial.   Declaratory and injunctive relief flow directly and automatically from proof of the common questions of law and fact regarding the existence of systemic gender discrimination against female employees at Sanofi-Aventis.   Declaratory and injunctive relief are the factual and legal predicates for Plaintiffs' and the class members' entitlement to monetary and non-monetary remedies for individual losses caused by, and for exemplary purposes necessitated by, such systemic discrimination.

### H. Requirements of Rule 23(b)(3)

41.     The common issues of fact and law affecting the claims of Plaintiffs and proposed class members, including, but not limited to, the common issues identified in Subsection D above, predominate over any issues affecting only individual claims.

42.     A class action is superior to other available means for the fair and efficient adjudication of the claims of Plaintiffs and members of the proposed class.

43.     The cost of proving Sanofi-Aventis's pattern and practice of discrimination makes it impracticable for Plaintiffs and members of the proposed class to pursue their claims individually.

## VII.  ALLEGATIONS OF THE PLAINTIFFS

### A.  KAREN BELLIFEMINE

#### Background

44.     **Plaintiff Karen Bellifemine** ("Ms. Bellifemine") was hired by Sanofi-Aventis in approximately July 1995 as a Primary Care Sales Representative.  Over the next twelve years, Ms. Bellifemine held a variety of positions at Sanofi-Aventis in New York and New Jersey.  Ms. Bellifemine became a Senior Primary Care Sales Representative in approximately 1996.  In approximately 1998, Ms. Bellifemine became a Hospital Representative, and in approximately 2003, Ms. Bellifemine became a Senior Cardiovascular Specialty Sales Representative.  Ms. Bellifemine went on medical leave in approximately March 2006 and returned to her Senior Cardiovascular Specialty Sales Representative position in January 2007.  During her tenure, Ms. Bellifemine has endured denials of promotion, disparate pay, differential treatment and a hostile work environment, sexual harassment, and retaliation.  Ms. Bellifemine filed a Class-wide EEOC

Charge of gender discrimination on or about March 8, 2006, in which she complained about the gender discrimination she and other females have experienced at Sanofi-Aventis.

### Denials of Promotion

45.     Despite excellent performance, Ms. Bellifemine faced consistent denials of promotion.  Ms. Bellifemine began receiving sales awards in February 1996, when she was awarded the Keftab Travel Award. The Keftab Travel Award was given to the top ten percent of the sales force for increasing the sales and market share of Keftab, a Sanofi-Aventis product. Ms. Bellifemine received a Regional Sales Award in February 2003, awarded to her for her position in the top ten percent of the entire U.S. sales force for all Sanofi-Aventis products sold in the 2002 calendar year.  In February 2004, Ms. Bellifemine was named to the Winners Circle for placing in the top five percent of the U.S. sales force for the 2003 calendar year.

46.     From approximately October 2001 to approximately December 2003, Ms. Bellifemine was assigned to the Hackensack, New Jersey Hospital territory.  It was while working in Hackensack that Ms. Bellifemine attained Winners Circle recognition, and she was instrumental in helping her territory achieve a high national ranking.  Although Ms. Bellifemine's sales numbers were excellent, in approximately December 2003, she was removed from her territory without her input, and without ever having been given the opportunity to become a manager.  Instead, Sanofi-Aventis began grooming male Sales Representative Todd Mikolajczk for a management position, and the company inserted him into Ms. Bellifemine's high-performing hospital territory in approximately January 2004.  During the time Mr. Mikolajczk served as a hospital representative in the Hackensack Territory, the sales ranking of this territory declined.  Despite this fact, approximately one year later, Mr. Mikolajczk was promoted to the position of Metabolism Sales Manager.

14

47.    In May 2005, Ms. Bellifemine applied for a promotion as a Hospital Sales Representative for two open territories in Hackensack, New Jersey.  Ms. Bellifemine was denied both positions.  Both of these positions were given to male employees, Dominick Miglizza and Daryl Macellaro.

48.    From October 2005 to December 2005, Ms. Bellifemine repeatedly contacted Sanofi-Aventis's Training Department and requested to participate in an in-house preceptorship training to become a sales trainer.  The training forum, Sanofi City, enables experienced sales representatives to work with newly hired sales representatives in the corporate training facility in Bridgewater, New Jersey.  Ms. Bellifemine's supervisor, District Manager Jeff Kotkin, strongly discouraged her from pursuing her interest in becoming a trainer.  Manager Kotkin also directed Ms. Bellifemine not to contact anyone in the sales training department, telling her that any further contact would result in "serious consequences."   Manager Kotkin also directed Ms. Bellifemine to copy him on any emails and voice mails she sent to Sanofi-Aventis employees.

**<u>Disparate Pay</u>**

49.    Upon information and belief, Ms. Bellifemine received a lower raise in 2005 than similarly situated male employees.

50.    Despite her exemplary sales record for the calendar years of 2002 and 2003, which enabled her to receive major sales awards for both years, Ms. Bellifemine's manager, Manager Kotkin, gave her only a three percent raise in salary in approximately April 2005. Concurrently, Manager Kotkin gave two male employees, Keith LeSueur and Oscar Velez, higher raises of four percent.  However, upon information and belief, Ms. Bellifemine's sales results were better than those of the two male coworkers.

51.     Ms. Bellifemine has been denied a merit-based raise for the past two years, despite her excellent sales performance. She is currently ranked #1 in her region for the sales year to date through the end of May, 2007.

## Differential Treatment and Hostile Work Environment

52.     Ms. Bellifemine has tolerated a hostile work environment and is held to a higher standard than male coworkers at Sanofi-Aventis.  In approximately January 2005, District Sales Manager Jeff Kotkin lost his temper and tried to force Ms. Bellifemine to admit to false accusations about her expense reports.

53.     On another occasion, Manager Kotkin bullied Ms. Bellifemine in an angry and vituperative manner until she began to cry.  Manager Kotkin's behavior was most objectionable on days when he and Ms. Bellifemine worked together one-on-one in a car, visiting various doctors' offices.  On another occasion, Manager Kotkin claimed Ms. Bellifemine had lied to him about doctors' hours and threatened to not recommend Ms. Bellifemine for an open hospital sales position for which she was interested in applying.  On yet another occasion, Manager Kotkin lost his temper and told his sales team, as witnessed by nine employees present, including Ms. Bellifemine, that he defaced his room because no one on his team had won an award.

54.     On or about June 9, 2005, Ms. Bellifemine reported Manager Kotkin to Human Resources because he had taken sample documents from her that were required by federal law when providing physicians with prescription pharmaceutical samples. To obtain these documents, Manager Kotkin demanded that Ms. Bellifemine drive him to her home.  When Ms. Bellifemine brought the documents from her home to her car, Manager Kotkin took the documents and then stated he was "building a case against" Ms. Bellifemine.  On or about June 9 and 10, 2005, Ms. Bellifemine documented Manager Kotkin's inappropriate behavior in emails

16

she sent to Kevin Phox in Human Resources.  She then requested a transfer to another position.  On or about July 11, 2005, the request was denied by the Regional Director Paul Spence.

55.     Upon information and belief, it is common practice for Sanofi-Aventis managers to ask team members to report on their interactions with colleagues, particularly if the manager is interested in building a case against a specific person.

## Sexual Harassment

56.     Ms. Bellifemine endured a sexually charged work environment.  In 2005, a sexually explicit email sent by Manager Kotkin and mentioning Sales Representative Wendy Schwartz quickly circulated around the division and was received by several employees, including Ms. Bellifemine.  Manager Kotkin defended himself by claiming the email originated in upper management.  Ms. Schwartz brought the email to the attention of Human Resources in approximately June 2006, in conjunction with Ms. Bellifemine's complaints.

57.     In addition, during an all male employee "happy hour" after a district meeting in early 2005, Sales Representative Scott Brick, then working under Manager Kotkin, was disgusted by sexually explicit language used to describe his female coworkers.  Mr. Brick contacted Sanofi-Aventis Human Resources after leaving the company in approximately June 2005 in support of the sexual harassment claims made by Ms. Bellifemine and two of her female coworkers.

## Retaliation

58.     Ms. Bellifemine reported the harassment and hostile work environment three times between June 2005 and February 2006 to Human Resources at Sanofi-Aventis.  Because of Ms. Bellifemine's complaints to Human Resources, Manager Kotkin retaliated against her.  In approximately December 2005, Manager Kotkin falsely accused Ms. Bellifemine of having poor

relationships with certain customers and poor communication skills.  On or about January 8, 2006, Ms. Bellifemine sent an email to Kevin Phox in Human Resources to report that Manager Kotkin had retaliated against her for reporting him to Human Resources several times.  Ms. Bellifemine explained to Mr. Phox that Manager Kotkin had documented his accusations against her in a memo dated December 22, 2005.  In addition to the false accusations concerning Ms. Bellifemine's job performance, Manager Kotkin's memo suggested Human Resources investigate his claims in what he termed a "360 evaluation" of Ms. Bellifemine.

59.    On or about February 22, 2006, Ms. Bellifemine notified Human Resources and complained about Manager Kotkin for his harassing and hostile behavior toward her.  In her complaint to Human Resources, Ms. Bellifemine stated that Manager Kotkin was retaliating against her by falsely accusing her and by threatening to harm her reputation at work.

60.    Ms. Bellifemine went on medical leave in approximately March 2006.  From approximately June 2006 to approximately October 2006, Sanofi-Aventis Human Resources continued to harass Ms. Bellifemine, denying her disability.   On October 1, 2006, Ms. Bellifemine was threatened with termination if she did not return to work, even though her doctor had stated that she was not physically ready.

61.    Further, during Ms. Bellifemine's Workers Compensation Hearing on January 9, 2007, Senior Director of Human Resources Kelly Byrne testified that Sanofi-Aventis is maintaining a "Green File" on Ms. Bellifemine.  Included in this "Green File" are documents written by Manager Kotkin falsely accusing Ms. Bellifemine of creating poor relationships with key Sanofi-Aventis physician-customers. On or about January 24, 2007, Ms. Bellifemine sent rebuttal letters to Ms. Byrne written by these same key physician-customers, demonstrating that Manager Kotkin's intent was to falsely document Ms. Bellifemine's performance, and to harass

and intimidate her.  On numerous occasions Ms. Bellifemine requested Mr. Phox and Ms. Byrne to investigate false accusations generated by Manager Kotkin, but a satisfactory investigation was apparently never conducted by the Sanofi-Aventis Human Resources Department.

### B.   AMY ZEOLI

#### Background

62.   **Plaintiff Amy Zeoli** ("Ms. Zeoli") was hired by Sanofi-Aventis in approximately early 2001 as a Senior Sales Representative.  Over the next five years, Ms. Zeoli continued to perform her duties as a Senior Sales Representative while also serving as a sales trainer and sitting on the Plavix Marketing Board as well as the Office Based Specialty Sales Board.  Ms. Zeoli quit her employment with Sanofi-Aventis in approximately March 2006 when it became apparent that she would not receive the promotion to a managerial position that she desired.

#### Denials of Promotion

63.   Despite outstanding performance, Ms. Zeoli faced consistent denials of promotion.  Ms. Zeoli began receiving sales awards almost from the moment she began her employment at Sanofi-Aventis, earning an expenses-paid vacation for placing within the top seven percent of sales representatives in her region in 2001, her very first year on the job.  Ms. Zeoli went on to win the same award in 2002, 2003, and 2004.  In addition, 2002 saw Ms. Zeoli win her region's Rookie of the Year award as well as a Certificate of Excellence, earned for her excellent sales numbers.  By the end of her tenure at Sanofi-Aventis, Ms. Zeoli was training new sales representatives, a task demonstrative of her strong sales skills.

64.   In approximately 2001, Ms. Zeoli was selected to participate in a Management Development Program designed to train Sales Representatives for managerial positions. Participating Sales Representatives were guaranteed managerial job interviews upon completion

with the understanding that they were preferred candidates. Ms. Zeoli's commitment to the Program surpassed that of her male colleagues; however, due to District Manager Steve Joseph's refusal to assist in her training, she was delayed in completing the Program. Additionally, upon completion, Ms. Zeoli was denied advancement to the managerial positions she had been promised, while her male counterparts were able to interview for management positions well before having completed the Program.

65.     Although Ms. Zeoli had stellar sales numbers, she was continually denied promotions into managerial positions to which she applied and for which she was well qualified. Specifically, Ms. Zeoli applied for three different open district manager positions in approximately 2004 and 2005 – one each in the states of New Jersey, Pennsylvania, and Connecticut.  Ms. Zeoli was awarded none of these three positions. Regional Sales Manager Holly May, the hiring manager for the district manager position in the Sanofi-Aventis's Connecticut territory, informed Ms. Zeoli, contradicting company regulations, that because Ms. Zeoli resided in the state of Connecticut, she was disqualified from being a district manager in the state.

66.     Though Ms. Zeoli was a perpetual candidate for new managerial openings, she was never selected for a promotion.  On or about July 14 and 15, 2005, Ms. Zeoli, along with one other female and ten males, was selected to attend a session at the company's "Management Development Assessor Center" in Richmond, Virginia.  During the program, Ms. Zeoli met with a psychological consultant hired by Sanofi-Aventis to help determine if potential applicants would make for effective managers.  During her session, the consultant, Andrea Brown, told Ms. Zeoli that she was "too pretty and young" and therefore would not be taken seriously as a

manager.  The consultant's assessment of Ms. Zeoli's potential contradicted her excellent score on the program's tests.

67.     During her tenure at Sanofi-Aventis Ms. Zeoli saw first-hand the unfair standards applied to managerial candidates.  Specifically, District Manger Steve Joseph was close personal friends with Jeff Kotkin since they were co-workers at a different pharmaceutical company.  In approximately 2004, Manager Joseph put in a good word for Mr. Kotkin, and Mr. Kotkin quickly became a district manager in New Jersey, overseeing Ms. Bellifemine, among others.  At the time, Mr. Kotkin had had absolutely no managerial experience, and it was abnormal for an outsider to be brought in at the managerial level.

68.     Shortly after Ms. Zeoli quit her employment at Sanofi-Aventis in approximately March 2006, her former co-worker Sales Representative Hilary Jackson quit Sanofi-Aventis as well.  Ms. Jackson later told Ms. Zeoli that one of the reasons she gave during her exit interview for leaving the company was Ms. Zeoli's failure to get promoted to a managerial position.

**Disparate Pay**

69.     Upon information and belief, Ms. Zeoli received a lower rate of pay than similarly situated male employees from approximately 2002 until she left the company in 2006.

70.     Ms. Zeoli began her employment at Sanofi-Aventis earning a salary of approximately $58,000 per year.  At the time she left the company in approximately March 2006, after winning numerous sales awards and serving as a sales trainer in her district, Ms. Zeoli was earning a base salary of approximately $71,000 per year.  However, in 2002, seven males were hired all at once from other pharmaceutical companies.  Sanofi-Aventis referred to them collectively as a "SWAT sales force."  Upon information and belief, the males that comprised this SWAT sales force began working at Sanofi-Aventis with a starting salary greater than

$80,000. Moreover, many of these males were quickly promoted. For example, Jeff LeTourneau, another referral from Manager Joseph, was promoted to a managerial position in less than a year, even though company regulations stipulate that one must be employed by Sanofi-Aventis for a minimum of 18 months prior to being promoted to a managerial position.

71. During a field ride with Manager Joseph in approximately March of 2005, Ms. Zeoli inquired about the possibility of a merit increase based on her outstanding performance. Manager Joseph replied that Ms. Zeoli's husband was an attorney, and therefore "must make money."

## Differential Treatment and Hostile Work Environment

72. Ms. Zeoli was subjected to a hostile work environment and was held to a higher standard than male coworkers by District Manager Steve Joseph. Manager Joseph became Ms. Zeoli's district manager in approximately late 2002. Shortly thereafter, it became apparent that Manager Joseph did not like Ms. Zeoli as a person or employee and was frank about it. For instance, on more than one occasion Manager Joseph would post on Cafepharma, an industry blog, about Ms. Zeoli, anonymously writing negative things about Ms. Zeoli in an effort to keep her from the management track. Ms. Zeoli's colleagues shared with her that he was responsible for the anonymous posts during a conversation in approximately February 2004 and when Ms. Zeoli asked Manager Joseph about her suspicions and mentioned she was going to file a complaint against him, the posts stopped. After this incident, Ms. Zeoli's husband, an attorney, wrote a letter to Manager Joseph's superior, Regional Sales Manager Holly May, but Sanofi-Aventis took no action against him.

73. In addition, as part of his job, Manager Joseph would make a number of sales calls a year with each representative in the district. During one ride-along in approximately

September 2004, Manager Joseph was especially hostile to Ms. Zeoli.  Despite her excellent sales numbers and the fact that at this point Ms. Zeoli was in charge of training new sales representatives, Manager Joseph berated her throughout the ride-along, criticizing all of the sales tactics that had enabled Ms. Zeoli to be so successful.  As a sales trainer, Ms. Zeoli knew that such negativity was counterproductive.  By the end of the ride-along, Ms. Zeoli could take no more of Manager Joseph's criticism, and asked him, "Do I do anything right?"  Instead of reassuring her, Manager Joseph wrote in his report of the ride-along that she had "had the nerve" to ask him such a question, and also wrote that Ms. Zeoli had asked this question and was being "defensive" in her sales review.  Manager Joseph berated Ms. Zeoli to the point that she would get physically ill.  On several occasions, Ms. Zeoli experienced anxiety attacks and consulted with Dr. Mark Mankus who prescribed an anti-anxiety medication for Ms. Zeoli to take prior to her interactions with Manager Joseph and the hostile work environment he created.

74.     In addition, Manager Joseph would routinely investigate Ms. Zeoli's sick days, vacation days, and expenses to ensure they were legitimate.  Manager Joseph conducted such investigations solely on Ms. Zeoli and not her male counterparts.  On one occasion, in approximately February 2005, Manager Joseph confronted Ms. Zeoli about a postal expense that she had itemized.  Manager Joseph recognized the ZIP code and berated Ms. Zeoli for sending personal mail at the company's expense, even though the letter in question was sent to her sales counterpart in Connecticut.  Conversely, Manager Joseph never questioned any males on the sales team about small expenses.

75.     In approximately January 2005, Ms. Zeoli was involved in a car accident and was forced to take disability leave to recuperate from her injuries.  During her absence, Manager Joseph called Ms. Zeoli repeatedly on the telephone, telling Ms. Zeoli and her colleagues that he

could give her job to someone else.  The calls continued until a representative from Occupational Health informed Manager Joseph that he was to not call Ms. Zeoli during her medical leave. During her leave, Manager Joseph attended a sales meeting and spotted a sales representative in attendance who was walking with the aid of crutches.  Upon seeing him, Manager Joseph rudely remarked to Ms. Zeoli's co-workers that if this man on crutches could make it, then Ms. Zeoli should be at the meeting as well.   Soon thereafter, Ms. Zeoli received phone calls from colleagues concerned that she might lose her job if she did not return to work right away.  Due to her colleagues' warnings, Ms. Zeoli feared that she would not receive a promotion or could even lose her job as a result of taking the disability to which she was entitled.  As such, Ms. Zeoli cut her disability time short and, instead of nursing a broken foot and injured back at home, returned to work on crutches.

76.     In addition, at a company holiday party in approximately December 2005, Manager Joseph uttered sexist comments concerning Sales Representative Kristen Peake to several of her team members. Manager Joseph had harassed Ms. Peake, one of Ms. Zeoli's colleagues in her sales district, throughout her pregnancy that year. Ms. Zeoli spoke with Manager Joseph's superior, Regional Sales Manager Holly May, and told her of specific discriminatory incidents involving Manager Joseph.  However, Ms. May told Ms. Zeoli that she "would not support" Ms. Zeoli if Ms. Zeoli brought these claims to Human Resources.  The only change that came from Ms. Zeoli's conversation with Ms. May was that Manager Joseph never again went on a ride-along with Ms. Zeoli.

77.     Ms. Zeoli put up with Manager Joseph's discrimination because she wanted to become a manager, and Sanofi-Aventis sales representatives need the support of district managers in order to a get an interview for a managerial position. Manager Joseph, however

would routinely inform Ms. Zeoli of open opportunities, but would fail to endorse her for any of the positions to which she applied.

## Sexual Harassment

78.     While at Sanofi-Aventis, Ms. Zeoli was subjected to sexual harassment from District Manager Steve Joseph.  Specifically, in approximately February 2001, before Manager Joseph was Ms. Zeoli's direct report manager, Manager Joseph, and the rest of the sales team attended a national sales meeting.  During a cocktail hour during the weekend-long meeting, Manager Joseph walked by Ms. Zeoli and inappropriately brushed up against her and blew her kisses.

79.     After Manager Joseph became district manager, he quickly fostered a sexually charged work atmosphere.  Ms. Zeoli was the only female present on her team of eight sales representatives.   During meetings, Ms. Zeoli's co-workers would habitually make lewd comments about Ms. Zeoli's breasts as well as other misogynistic slurs.  Regardless of the inappropriateness of the comments, Manager Joseph never reprimanded any of the males on Ms. Zeoli's team.

### C.     MICHELLE POPA

## Background

80.     **Plaintiff Michelle Popa** ("Ms. Popa") was hired by Sanofi-Aventis in approximately November 2003 as a Sales Representative in the East Fort Lauderdale district. During her tenure, Ms. Popa endured denials of promotion and disparate pay.  Ms. Popa quit her employment with Sanofi-Aventis in approximately January 2007 when it became apparent that she would not receive the promotion to a managerial position that she desired.

## Denials of Promotion

81.    Despite excellent performance, Ms. Popa faced consistent denials of promotion. When Ms. Popa was hired by Sanofi-Aventis in approximately November 2003, the sales representative whom she was replacing was ranked 465 out of 500 nationally in his product line. Ms. Popa quickly proved integral in improving her traditionally underperforming district.   In 2005, Ms. Popa earned "Jewelry Award" recognition for placing in the top 20 percent of sales representatives nationwide.  Ms. Popa shortly became a favorite of the physicians with whom she worked, once drawing 65 doctors to a dinner program she ran.  Many of the physicians had her cell phone number and some of them wrote her letters of recommendation after she quit her employment at Sanofi-Aventis.  In addition to her outstanding sales numbers and her favorable relationships with many physicians, Ms. Popa held both a Bachelor's and a Master's degree. Despite Ms. Popa's excellent qualifications, she was continually denied promotional opportunities.

82.    For example, in approximately February 2006, Ms. Popa was selected for an interview for an open Hospital Sales Representative position in Raleigh-Durham, North Carolina.  Ms. Popa was interested in the position not only because it represented a promotion, but also because her husband had job opportunities in the Raleigh-Durham area.  Ms. Popa readied all of her application materials, but when she arrived at the interview, the hiring manager, a male, name unknown, was not there and never arrived to perform the interview. Instead, without previously apologizing for having not attended the scheduled interview, the hiring manager telephoned Ms. Popa at home at around 7:00 in the evening.  He proceeded to conduct the interview while her children were in the background.  Ms. Popa was later informed that, despite her qualifications, she was not selected for the position.

83.     On another occasion, in approximately Spring 2006, Ms Popa applied for an open Hospital Sales Representative position in the Fort Lauderdale area.  Ms. Popa interviewed with District Manager Drew Diaz and then twice with Sales Representative Lisa Capinella, with whom Ms. Popa had previously worked.  During these interviews, Ms. Capinella inappropriately asked Ms. Popa, the mother of five children, how her children would get to school and who would take care of them if she were given the Hospital Sales Representative position and the heightened responsibility that would come with it.   Subsequent to her interviews with Ms. Capinella, Manager Diaz set up an 8:00 a.m. interview for Ms. Popa with the district manager in Orlando, a three-hour drive from Fort Lauderdale.  Ms. Popa found this to be outrageous; a District Manager in Orlando would have no relationship with a Hospital Sales Representative in Fort Lauderdale.  During the interview with the male Orlando District Manager, name unknown, he repeatedly insinuated that the promotion represented a big life change for Ms. Popa and that it would be hard on her family.  Following the interview, Ms. Popa never heard back from anyone regarding whether she would be given the job.  Much later, Ms. Popa learned that Angelina Guerra, a 23 year-old female, was given the job.  Ms. Guerra had been in her Office Based Specialty position for less than four months, even though company regulations stipulated that a representative needed to be employed in his or her current position by Sanofi-Aventis for a minimum of 18 months before attaining a promotion.

84.     On yet another occasion, in approximately Summer 2006, Ms. Popa applied for an Office Based Specialty position in Fort Lauderdale.  The day that the hiring manager, Carlos Diaz, called her regarding her application, Ms. Popa was taking a vacation day.  Manager Diaz told Ms. Popa that she would have to come in to interview that very day, regardless of whether she was taking a vacation day.  Ms. Popa went to the interview on short notice and was not given

the job.  Instead, the position was given to Sales Representative LeTerrance LNU, who had to relocate to begin the job.  Ms. Popa would not have had to relocate for the position, but was nevertheless not given the promotion for which she was well qualified.  Ms. Popa later learned that LeTerrance was close personal friends with the Regional Manager of the Fort Lauderdale territory, ReShay Abduhac.

## Disparate Pay

85.     Upon information and belief, Ms. Popa received a lower rate of pay throughout her tenure than similarly situated male employees.

86.     At one point during her employment with Sanofi-Aventis, Ms. Popa was earning a base salary of $51,000 per year while the males on her team were earning approximately $70,000.  This pay discrepancy belied the fact that Ms. Popa had attained a Master's degree while most of her male co-workers had not.  Ms. Popa was never given a raise of more than three percent, a grievance which she addressed both to Juan Ledesma and to Chris Edwards, the two individuals who served as Ms. Popa's district managers during her tenure.


## D.     SUE SULLIVAN

### Background

87.     **Plaintiff Sue Sullivan** ("Ms. Sullivan") was hired by Sanofi-Aventis in approximately October 2002 as a Medical Center Specialist.  Ms. Sullivan became a Senior Hospital Account Specialist in 2004 and a CNS Representative in 2005, a position she held until approximately July 2006 when she resigned after being subjected to sexual harassment.  During her tenure, Ms. Sullivan endured differential treatment, a hostile work environment, and sexual harassment.

## **Differential Treatment and Hostile Work Environment**

88.     Ms. Sullivan was subjected to a hostile work environment and was held to a higher standard than male coworkers at Sanofi-Aventis.  For example, almost from the moment she became a CNS Specialty Representative, her new district manager, Frank Garay, created an unendurably hostile work environment for Ms Sullivan.

89.     Specifically, during the first meeting between Ms. Sullivan and District Manager Garay following Ms. Sullivan's transfer, Manager Garay told Ms. Sullivan that he had heard bad things about her from another manager, despite the fact that Ms. Sullivan's recent annual review stated that she had "exceeded expectations."  Further, Ms. Sullivan had earned the Titanium Award for the 2005 calendar year for "high market share achievement."  In 2005, Ms. Sullivan received the Plavix Award and the Ambien Award for high market share growth for both of those Sanofi-Aventis products.  Nevertheless, Manager Garay informed Ms. Sullivan that because he did not hire her – she had transferred onto his team – he had friends elsewhere in the company with whom he would consider replacing her.

90.     As Ms. Sullivan's CNS Specialty position continued, so too did the hostility from Manager Garay.  For instance, on or about June 23, 2005, Ms. Sullivan overheard Manager Garay talking about the Tommy Lee and Pamela Anderson video with another member of the team.  On another occasion, in approximately July 2005, during a sales meeting in Dallas, Manager Garay took the males on their sales team to a strip club.

91.     In addition, in approximately October 2005, Manager Garay had lunch with two females on Ms. Sullivan's team, Cynthia Palombo and Kristen Langone, and asked them if they got along with Ms. Sullivan and if she talked about Manager Garay behind his back.  Ms. Sullivan's two colleagues called her immediately after the lunch to tell her about the

conversation.  Shortly thereafter, Ms. Sullivan called Manager Garay and asked if he wanted to talk about any issues with her.  Manager Garay stated that his questioning of her colleagues had been about her sales numbers, and it was nothing personal.  Ms. Sullivan reminded him that she had just started with her new position in May, and he was looking at numbers from July; she had not had time to get used to the job or build relationships with clients.  Further, on or about November 1, 2005, Manager Garay phoned another district manager, Dawn Gillespie, and told Ms. Gillespie to relay to her Sales Representatives not to talk to Ms. Sullivan about ideas or successes they had had in the territory.

92.     In addition, in November 2005, Manager Garay began leaving Ms. Sullivan angry voicemail messages, accusing her of turning in administrative work late, although it never once was.  Later in the month, Ms. Sullivan confronted Manager Garay about the accusations and kept talking to him until he finally admitted that he indeed had received her work.  Further, on or about December 23, 2005, the Friday before Christmas Day, Manager Garay asked Ms. Sullivan to meet him for lunch.  At lunch, Manager Garay asked Ms. Sullivan if she was sure she wanted to stay at Sanofi-Aventis. At that time, Manager Garay had only spent three days with Ms. Sullivan during her sales calls, and for merely two to three hours each time.  From approximately July 2005 until approximately the end of February 2006, Manager Garay did not make one full day of calls with Ms. Sullivan.

93.     In addition, on approximately May 9, 2006, during a sales meeting in St. Louis, Manager Garay had his team watch the film "Groundhog Day" so they would learn about the process of interviewing doctors and to take lessons from seeing Mr. Murray getting "the girl in bed" at the end of the movie.  Also during the St. Louis meeting, Manager Garay announced, during a meeting session, that a male on the team wanted to see one of the women in a bikini

sometime during the trip.  Moreover, in a bus on the way to the airport to leave St. Louis, Ms. Sullivan witnessed Manager Garay slapping a female co-worker on the rear.

94.      In May 2006, Ms. Sullivan's final month with Sanofi-Aventis before resigning, it became apparent that Manager Garay was speaking with a Sales Representative from a competitor in an effort to try to hire her.  Further, also in May 2006, Ms. Sullivan was injured and had to visit the emergency room.  Manager Garay told another Sales Representative that Ms. Sullivan was lying and that she had not actually been hurt.  Shortly thereafter, Ms. Sullivan quit her employment at Sanofi-Aventis.

## Sexual Harassment

95.      Ms. Sullivan was forced to endure a sexually charged work environment.  For example, during the sales calls in which Manager Garay accompanied Ms. Sullivan, he would often use sexually suggestive language and make misogynistic comments.

96.      Further, during her annual performance reviews, Manager Garay routinely told Ms. Sullivan that her physician-clients liked her smile or her "butt."  During Ms. Sullivan's annual performance review in approximately April 2006, Manager Garay had been drinking beforehand and continued to drink during the review, contributing to his lewdness.

## COUNT I
## VIOLATIONS OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. § 2000, *et seq.*, AS AMENDED

## GENDER DISCRIMINATION

97.      Plaintiffs re-allege and incorporate by reference each and every allegation contained in each and every aforementioned paragraph as though fully set forth herein.

98.     Sanofi-Aventis has discriminated against Plaintiffs and all members of the proposed class by treating them differently from and less preferably than similarly situated male employees and by subjecting them to discriminatory denials of promotions, discriminatory denials of pay raises, discriminatory performance evaluations, discriminatory subjection to disciplinary procedures, disparate pay, disparate terms and conditions of employment, harassment, hostile work environments, and other forms of discrimination in violation of Title VII.

99.     Sanofi-Aventis's conduct has been intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of the rights of Plaintiffs and the members of the proposed class.

100.    As a direct and proximate result of Sanofi-Aventis's aforementioned conduct, Plaintiffs and the members of the proposed class were damaged and suffered economic losses, mental and emotional harm, anguish, and humiliation.

101.    Sanofi-Aventis's policies, practices, and/or procedures have produced a disparate impact against Plaintiffs and the class members with respect to their terms and conditions of employment.

102.    By reason of the continuous nature of Sanofi-Aventis's discriminatory conduct, persistent throughout the employment of Plaintiffs and class members, Plaintiffs and class members are entitled to application of the continuing violation doctrine to all of the violations alleged herein.

103.    By reason of the discrimination suffered at Sanofi-Aventis, Plaintiffs and the members of the proposed class are entitled to all legal and equitable remedies available under Title VII.

## COUNT II
## VIOLATIONS OF N.Y. EXEC. LAW § 296

### GENDER DISCRIMINATION

104.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in each and every aforementioned paragraph as though fully set forth herein.

105.    Because of their gender, Sanofi-Aventis discriminated against Plaintiffs and the members of the proposed class in compensation or in the terms, conditions or privileges of their employment, in violation of New York Executive Law § 296.

106.    Because of their gender, Sanofi-Aventis also denied or withheld from Plaintiffs and the members of the proposed class their right to be admitted to or participate in an on-the-job training program, executive training program and/or management training program in violation of New York Executive Law § 296.

107.    Sanofi-Aventis further discriminated against Plaintiffs and the members of the proposed class in their pursuit of such programs and discriminated against them in the terms, conditions or privileges of such programs because of gender, in violation of New York Executive Law § 296.

108.    As a direct and proximate result of Sanofi-Aventis's aforementioned conduct, Plaintiffs and the members of the proposed class were damaged and suffered economic losses, mental and emotional harm, anguish and humiliation.

109.    By reason of the continuous nature of Sanofi-Aventis's discriminatory conduct, persistent throughout the employment of Plaintiffs and class members, Plaintiffs and the

members of the proposed class are entitled to application of the continuing violation doctrine to all of the violations alleged herein.

110.     By reason of the gender discrimination suffered at Sanofi-Aventis, Plaintiffs and the members of the proposed class are entitled to all legal and equitable remedies available under New York Executive Law § 296.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and the members of the class whom they seek to represent, request the following relief:

A.     Certification of the case as a class action maintainable under Federal Rules of Civil Procedure Rule 23 (a), (b)(2), and/or (b)(3), on behalf of the proposed plaintiff class, and designation of the Plaintiffs as representatives of this class and their counsel of record as class counsel;

B.     Declaratory judgment that Sanofi-Aventis's employment policies, practices, and/or procedures challenged herein are illegal and in violation of Title VII;

C.     A permanent injunction against Sanofi-Aventis and its partners, officers, owners, agents, successors, employees, and/or representatives, and any and all persons acting in concert with them, from engaging in any further unlawful practices, policies, customs, usages, and gender discrimination by the Defendants as set forth herein;

D.     An Order requiring Sanofi-Aventis to initiate and implement programs that (i) will provide equal employment opportunities for female employees; (ii) will remedy the effects of the Defendants' past and present unlawful employment policies, practices and/or procedures; and (iii) will eliminate the continuing effects of the discriminatory and retaliatory practices described above;

E.     An Order requiring Sanofi-Aventis to initiate and implement systems of assigning, training, transferring, compensating and promoting female employees in a non-discriminatory manner;

F.     An Order establishing a task force on equality and fairness to determine the effectiveness of the programs described in (D) and (E) above, which would provide for (i) monitoring, reporting, and retaining of jurisdiction to ensure equal employment opportunity; (ii) the assurance that injunctive relief is properly implemented; and (iii) a quarterly report setting forth information relevant to the determination of the effectiveness of the programs described in (D) and (E) above;

G.     An Order placing or restoring Plaintiffs and the class members into those jobs they would now be occupying but for Sanofi-Aventis's discriminatory policies, practices, and/or procedures;

H.     An Order directing Sanofi-Aventis to adjust the wage rates and benefits for Plaintiffs and the class members to the level that they would be enjoying but for the Defendants' discriminatory policies, practices, and/or procedures;

I.     An award of back pay, front pay, lost benefits, preferential rights to jobs and other damages for lost compensation and job benefits suffered by Plaintiffs and the class members to be determined at trial;

J.     Any other appropriate equitable relief to which Plaintiffs and proposed class members are entitled;

K.     An award of compensatory, nominal, and punitive damages to Class Representatives and the class in an amount not less than 300 million dollars;

L.      An award of litigation costs and expenses, including reasonable attorneys' fees, to

Plaintiffs and class members;

M.      Pre-judgment interest;

N.      Post-judgment interest;

O.      Such other and further relief as the Court may deem just and proper; and

P.      Retention of jurisdiction by the Court until such time as the Court is satisfied that

the Defendants have remedied the practices, policies, and/or procedures complained of herein

and are determined to be in full compliance with the law.

## DEMAND FOR JURY

Plaintiffs demand trial by jury of all issues triable of right to a jury.

Respectfully submitted this 29th day of August, 2007:

/s/  David Sanford
David Sanford, D.C. Bar No. 457933
dsanford@nydclaw.com
Meenoo Chahbazi, CA Bar No. 233985
mchahbazi@nydclaw.com
**SANFORD, WITTELS & HEISLER, LLP**
1666 Connecticut Ave. NW
Suite 310
Washington, D.C. 20009
Telephone: (202) 742-7780
Facsimile:  (202) 742-7776
dsanford@nydclaw.com


Steven Wittels, (SLW-8110)
swittels@nydclaw.com
Jeremy Heisler, (JH-0145)
jheisler@nydclaw.com
**SANFORD, WITTELS & HEISLER, LLP**
950 Third Avenue
10th Floor
New York, NY 10022
Telephone: (646) 456-5695
Facsimile: (646) 723-2948

Grant Morris, D.C. Bar No. 926253
grantemorris@gmail.com
**LAW OFFICES OF GRANT E. MORRIS**
1666 Connecticut Ave. NW
Suite 310
Washington, D.C. 20009
Telephone: (202) 742-7783
Facsimile:  (202) 742-7776

*Attorneys for Plaintiffs*