# EXHIBIT F

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| KAREN BELLIFEMINE, AMY ZEOLI, MICHELLE POPA, NANCY BEANEY and JENNIFER STORM, **Individually and on Behalf of Others Similarly Situated,** PLAINTIFFS, v. SANOFI-AVENTIS U.S. LLC DEFENDANT. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **THIRD AMENDED COMPLAINT** **Case No. 1:07-CV-02207-JGK** **JURY TRIAL DEMANDED** |

## THIRD AMENDED CLASS ACTION COMPLAINT

### I.    NATURE OF THIS ACTION

1.     Five current and former employees of Sanofi-Aventis, Karen Bellifemine, Amy Zeoli, Michelle Popa, Nancy Beaney and Jennifer Storm (collectively "Class Representatives" or "Plaintiffs") bring this action against their current or former employer, Sanofi-Aventis U.S. LLC ("Sanofi-Aventis" or "Defendant") to redress gender discrimination in employment.

2.     Class Representatives bring this class action on behalf of themselves and all other female employees of Sanofi-Aventis who are similarly situated pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e), *et seq.*, as amended ("Title VII"). Additionally, Plaintiff Karen Bellifemine brings claims on behalf of herself and a subclass of Sanofi-Aventis female employees in New York, pursuant to Fed. R. Civ. P. 23, to redress violations of New York law.

3.    Class Representatives seek to represent female employees of Sanofi-Aventis who have been subjected to the systemic disparate impact and disparate treatment gender discrimination described in this Complaint, which is based on: (a) specific discriminatory policies, practices, and/or procedures in selection, promotion and advancement, described herein; (b) disparate pay; and (c) differential terms and conditions of employment. The systemic gender discrimination described in this Complaint is continuing in nature.

4.    Class Representatives are seeking, on behalf of themselves and the class they seek to represent, declaratory and injunctive relief; back pay; front pay; compensatory, nominal, and punitive damages; and attorneys' fees, costs, and expenses to redress Sanofi-Aventis's pervasive and discriminatory employment policies, practices and/or procedures.

## II.    JURISDICTION AND VENUE

5.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because the action is based on Title VII, which is a federal statute.

6.    Venue is proper in the Southern District of New York pursuant to 28 U.S.C. §§ 1391(b)(1) and 1391(c), because Defendant is subject to personal jurisdiction in New York.

7.    The Southern District of New York is the most logical forum in which to litigate the claims of Plaintiffs and the proposed class in this case. Sanofi-Aventis has both a physical presence and a Registered Agent in the State of New York. Further, Plaintiff Bellifemine resides and has performed work for Defendant in the State of New York.

## III.    PROCEDURAL HISTORY

8.    Class Representative Bellifemine filed a Class-wide Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on or about March 8, 2006.

Ms. Bellifemine received her Notice of Right to Sue on or about December 22, 2006, and timely filed suit within ninety (90) days of receipt, on March 14, 2007.

9.     Ms. Bellifemine, along with Amy Zeoli, Michelle Popa and Sue Sullivan, filed a First Amended Complaint on August 28, 2007.

10.     On January 31, 2008, Plaintiffs filed a Second Amended Complaint and added Plaintiffs Nancy Beaney and Jennifer Storm.

11.     On April 4, 2008, Plaintiffs and Defendant filed a stipulation to dismiss Plaintiff Sue Sullivan.

## IV.     PARTIES

### A.     Plaintiffs

12.     **Title VII Class Representative and Class Representative for the New York Subclass Karen Bellifemine** is a female citizen of the United States and a resident of Nanuet in the State of New York.   Ms. Bellifemine has been employed by Sanofi-Aventis from approximately July 1995 to the present in Sanofi-Aventis's New York and New Jersey territories.   Throughout that time, Ms. Bellifemine has worked as a Primary Care Sales Representative, a Hospital Representative, and a Senior Cardiovascular Specialty Sales Representative.   Ms. Bellifemine went on medical leave in approximately March 2006 and returned to her Senior Cardiovascular Specialty Sales Representative position in January 2007.

13.     **Title VII Class Representative Amy Zeoli** is a female citizen of the United States and a resident of Cheshire in the State of Connecticut.   Ms. Zeoli was employed by Sanofi-Aventis from approximately early 2001 through approximately March 2006 as a Sales Representative, a Senior Sales Representative, and a Territory Manager, Cardiovascular

Specialty Sales in Sanofi-Aventis's Connecticut territory. Ms. Zeoli held her Senior Sales Representative position until her constructive discharge in approximately March 2006.

14.   **Title VII Class Representative Michelle Popa** is a female citizen of the United States and a resident of Noblesville in the State of Indiana. Ms. Popa began her employment with Sanofi-Aventis in approximately November 2003 as a Sales Representative in Sanofi-Aventis's East Fort Lauderdale, Florida territory. Ms. Popa continued to work in this capacity until she was constructively discharged in approximately January 2007.

15.   **Title VII Class Representative Nancy Beaney** is a female citizen of the United States and a resident of McKinney in the State of Texas. Ms. Beaney has been employed by Sanofi-Aventis from approximately April 1991 to the present in Sanofi-Aventis's Dallas, Texas territory. Throughout that time, Ms. Beaney has worked as a Primary Care Sales Representative, a Cardiovascular Sales Consultant and a Primary Care Executive Sales associate. Ms. Beaney became a Senior CNS Specialty Sales Professional in 2005 and currently holds that position.

16.   **Title VII Class Representative Jennifer Storm** is a female citizen of the United States and a resident of Tyrone in the State of Pennsylvania. Ms. Storm began her employment in approximately September of 2003 as a Primary Care Sales Representative in Sanofi-Aventis's Pennsylvania territories. Ms. Storm continued to work in this capacity until she was constructively discharged in approximately July 2007.

**B.    Defendant**

17.   **Defendant Sanofi-Aventis U.S. LLC** is an affiliate of, and the United States headquarters for, Sanofi-Aventis. Sanofi-Aventis is a French company created in 2004 by the merger of the French companies Sanofi-Synthelabo and Aventis. Sanofi-Aventis is a world leader in the research and development of health care products. Sanofi-Aventis's core business

4

is in pharmaceuticals, specifically the prescription market. Sanofi-Aventis is incorporated in the State of Delaware and physically located at 55 Corporate Drive, Bridgewater, New Jersey. Sanofi-Aventis has a Registered Agent in the State of New York.

## V.    CLASS CLAIMS

18.    Class Representatives and the class they seek to represent have been subjected to a systemic pattern and practice of gender discrimination involving a battery of practices that have also had an unlawful disparate impact on them and their employment opportunities. This gender discrimination includes policies and/or practices of restricting the promotion and advancement opportunities of female employees so that they remain in lower classification and compensation levels. Sanofi-Aventis in effect bars females from better and higher-paying positions which have traditionally been held by male employees. The systemic means of accomplishing such gender stratification include, but are not limited to, Sanofi-Aventis's promotion, advancement, training and performance evaluation policies, practices, and/or procedures.

19.    Sanofi-Aventis's promotion, advancement, training, and performance evaluation policies, practices, and/or procedures incorporate the following discriminatory practices: (a) relying upon subjective selection methods, judgments, procedures, and criteria which allow for gender discrimination in making promotion, training, performance evaluation, and compensation decisions; and (b) refusing or failing to establish and/or follow policies, practices, procedures, or criteria that reduce or eliminate disparate impact and/or intentional gender bias.

20.    Sanofi-Aventis's promotion policies, practices, and/or procedures have had a disparate impact on female employees. Such policies, practices, and/or procedures are not valid, job-related, or justified by business necessity. There are alternative objective and more valid selection procedures available to the Defendant that are more closely related to the actual

responsibilities of the positions and that would have less of a disparate impact on females. However, the Defendant has failed or refused to use such alternative procedures.

21.    The Defendant's promotion, training, performance evaluation, compensation, and transfer policies, practices, and/or procedures are intended to have a disparate impact on Plaintiffs and the class they seek to represent.  Such practices form a part of the Defendant's overall pattern and practice of keeping females in the lower classifications with less desirable terms and conditions of employment.  Upon information and belief, the specific policies and practices of gender discrimination and stratification include but are not limited to the following:

    a.    Sanofi-Aventis fails to provide to all employees consistent, timely notice of job openings, promotional opportunities, and procedures for obtaining a promotion. Because many female employees do not receive adequate notice regarding how to obtain promotional opportunities, they are denied an equal opportunity to apply for promotions and advancements.

    b.    Sanofi-Aventis solicits, pre-selects and "grooms" male employees for promotions to higher positions, favorable assignments, and training.

    c.    Sanofi-Aventis favors males in the assignment of territories and assigns males to sales territories that have greater potential for higher sales than those given to female sales employees.

    d.    Sanofi-Aventis discriminatorily provides greater training opportunities to male employees to help groom them for promotions.

    e.    Sanofi-Aventis requires managers to give permission to an employee to apply for a promotion, relying on managerial discretion and subjective decision-making which disproportionately affect female employees and hinder their advancement.

f.    Sanofi-Aventis selectively applies a policy of requiring representatives to work in their given position 18 months before obtaining a promotion, resulting in a disparate impact upon women. Loopholes and exceptions to this policy are made to allow Sanofi-Aventis to promote pre-selected and groomed male employees.

g.    Sanofi-Aventis employs a system of performance evaluations that relies upon subjective interpretations of performance and expectations and results in a disparate impact on female employees.

h.    Sanofi-Aventis hires external male candidates rather than advancing internal female candidates to fill vacancies and promotional positions, resulting in a disparate impact on female employees.

i.    Sanofi-Aventis fails to apply in a consistent manner basic requirements such as tenure, pay scale and awards, resulting in a disparate impact on female employees.

j.    Sanofi-Aventis discriminatorily denies equal compensation to female employees.

k.    Sanofi-Aventis engages in the discriminatory practice of advancing female employees more slowly than their male counterparts.

l.    Sanofi-Aventis fails to prevent sexual harassment targeted at female employees by male managers.

m.    Sanofi-Aventis relies upon subjective criteria, including managerial discretion in performance evaluations, territory assignments, training, and pay and promotional decisions.

n.     Sanofi-Aventis selectively and disproportionally disciplines and punishes women for minor infractions.

22.     Because of the Defendant's systemic pattern and practice of gender discrimination, Plaintiffs and the class they seek to represent have been adversely affected and have experienced harm, including loss of compensation, wages, back pay, and employment benefits. This pattern and practice of gender discrimination includes: being denied promotions in favor of equally or less qualified male employees; receiving lower performance appraisals for performing the same work at the same level as male employees; and being paid less than similarly situated male employees.

23.     Class Representatives and class members have no plain, adequate, or complete remedy at law to redress the rampant and pervasive wrongs alleged herein; this suit is their only means of securing adequate relief. Class Representatives and class members are now suffering irreparable injury from Sanofi-Aventis's unlawful policies, practices, and/or procedures as set forth herein, and will continue to suffer unless those policies, practices, and/or procedures are enjoined by this Court.

## VI.     CLASS ACTION ALLEGATIONS

### A.     Class Definition

24.     Class Representatives seek to maintain claims on their own behalf and on behalf of a class of current and former Sanofi-Aventis employees. Plaintiffs are members of the class.

25.     The class consists of all female citizens of the United States who are, or have been, employed by Sanofi-Aventis in the United States at any time during the applicable liability period. Upon information and belief, there are thousands, of members of the proposed class.

**B.    Efficiency of Class Prosecution of Common Claims**

26.    Certification of a class of female employees similarly situated to Plaintiffs is the most efficient and economical means of resolving the questions of law and fact which are common to the claims of Plaintiffs and the proposed class. Plaintiffs' individual claims require resolution of the question of whether Sanofi-Aventis has engaged in a systemic pattern and/or practice of gender discrimination against female employees. Plaintiffs seek remedies to eliminate the adverse effects of such discrimination in their own lives, careers, and working conditions, and in the lives, careers, and working conditions of the proposed class members, as well as to prevent continued gender discrimination in the future. Plaintiffs have standing to seek such relief because of the adverse effect that such discrimination has had on them individually and on females generally. In order to gain relief for themselves, as well as for the proposed class members, Plaintiffs will first establish the existence of systemic gender discrimination. Without class certification, the same evidence and issues would be subject to re-litigation in a multitude of individual lawsuits with an attendant risk of inconsistent adjudications and conflicting obligations. Certification of the proposed class of females who have been affected by these common questions of law and fact is the most efficient and judicious means of presenting the evidence and arguments necessary to resolve such questions for Plaintiffs, the proposed class and Sanofi-Aventis.

**C.    Numerosity and Impracticability of Joinder**

27.    The class that Class Representatives seek to represent is too numerous to make joinder practicable. The proposed class consists of hundreds, if not thousands, of current, former, and future female employees during the liability period.

9

**D.    Common Questions of Law and Fact**

28.    The prosecution of Plaintiffs' claims will require the adjudication of numerous questions of law and fact common to both Plaintiffs' individual claims and those of the proposed class.    The common questions of law include, *inter alia*: (a) whether Sanofi-Aventis has engaged in unlawful, systemic gender discrimination in its compensation, selection, promotion, advancement, transfer, training, and discipline policies, practices, and/or procedures, and in the general terms and conditions of work and employment; and (b) whether Sanofi-Aventis is liable for a continuing systemic violation of Title VII.

29.    The common questions of fact would include, *inter alia*: whether, through its policies, practices and/or procedures: (a) Sanofi-Aventis has denied or delayed the promotion of females; (b) Sanofi-Aventis has precluded females from eligibility for promotions by denying them training that male employees are afforded; (c) Sanofi-Aventis has paid females less than comparable male employees; and (d) Sanofi-Aventis has engaged in a pattern and practice of failing to take prompt and effective action to remedy the gender discrimination in its workplace.

30.    The employment policies, practices, and/or procedures to which Plaintiffs and the proposed class are or have been subjected are set at Sanofi-Aventis's corporate level and apply universally to all class members throughout the country.    These employment policies, practices, and/or procedures are not unique or limited to any department; rather, they apply to all departments, and, thus, affect Plaintiffs and proposed class members no matter the district, division, or position in which they work.

31.    Discrimination in selection, promotion and advancement occurs as a pattern and practice throughout all levels and all divisions of Sanofi-Aventis.    Selection, promotion, and advancement opportunities are driven by personal familiarity, subjective decision-making, pre-

selection, and interaction between male managers, supervisors, and subordinates rather than by merit or equality of opportunity. As a result, male employees have advanced and continue to advance more rapidly to better and higher paying jobs than female employees.

32.    Sanofi-Aventis's policies, practices, and/or procedures have had an adverse impact on females seeking selection for, or advancement to, better and higher paying positions.

**E.    Typicality of Claims and Relief Sought**

33.    Class Representatives' claims are typical of the claims of the proposed class. Plaintiffs assert claims in each of the categories of claims they assert on behalf of the proposed class. The relief sought by Plaintiffs for gender discrimination complained of herein is also typical of the relief that is sought on behalf of the proposed class.

34.    Class Representatives, like the members of the proposed class, are female employees who have worked for the Defendant during the liability period.

35.    Discrimination in selection, promotion, advancement, and training affects the Class Representatives and the proposed class members in similar ways.

36.    Differential treatment between male and female employees occurs as a pattern and practice throughout all levels and departments of Sanofi-Aventis. Sanofi-Aventis's predominantly male managers hold female employees, including both Class Representatives and class members, to stricter standards than male employees, and thus female employees often receive lower performance appraisals than do males for performing at the same level. Female employees are also disciplined, formally and informally, more frequently and severely than their male counterparts.

37.    Class Representatives and other female employees have complained to Sanofi-Aventis's management and Human Resources about gender discrimination and a sexually hostile

work environment. Company investigations into these complaints have been inadequate and/or superficial. Class Representatives and the class members have been affected in the same ways by Sanofi-Aventis's failure to implement adequate procedures to detect, monitor, and correct this pattern and practice of discrimination.

38.    Sanofi-Aventis has failed to create adequate incentives for its managers to comply with equal employment opportunity laws regarding each of the employment policies, practices, and/or procedures referenced in this Complaint, and has failed to adequately discipline its managers and other employees when they violate the anti-discrimination laws. These failures have affected Class Representatives and the class members in similar ways.

39.    The relief necessary to remedy the claims of the Class Representatives is exactly the same as that necessary to remedy the claims of the proposed class in this case. Class Representatives seek the following relief for their individual claims and for those of the members of the proposed class: (a) a declaratory judgment that Sanofi-Aventis has engaged in systemic gender discrimination against female employees by limiting their ability to be promoted to better and higher paying positions, limiting their employment opportunities to lower and less desirable classifications, limiting their training and transfer opportunities, exposing them to differential treatment, subjecting them to gender hostility at work, subjecting them to sexual harassment and a sexually hostile work environment, and retaliating against them for complaining about the gender discrimination to which they are subjected; (b) a permanent injunction against such continuing discriminatory conduct; (c) injunctive relief which effects a restructuring of Sanofi-Aventis's promotion, transfer, training, performance evaluation, compensation, work environment, and discipline policies, practices, and/or procedures so that females will be able to compete fairly in the future for promotions, transfers, and assignments to better and higher

paying classifications with terms and conditions of employment traditionally enjoyed by male employees; (d) equitable relief which effects a restructuring of the Sanofi-Aventis workforce so that females are promoted into higher and better paying classifications than they would have held in the absence of Sanofi-Aventis's past gender discrimination; (e) back pay, front pay, and other equitable remedies necessary to make female employees whole from Defendant's past discrimination; (f) compensatory damages; (g) punitive and nominal damages to prevent and deter Sanofi-Aventis from engaging in similar discriminatory practices in the future; and (h) attorneys' fees, costs, and expenses.

### F.    Adequacy of Representation

40.    Class Representatives' interests are co-extensive with those of the members of the class that they seek to represent in this case. Class Representatives seek to remedy Sanofi-Aventis's discriminatory employment policies, practices, and/or procedures so that females will no longer be prevented from advancing into higher paying and more desirable positions, will not receive disparate pay and differential treatment, will not be subjected to gender hostility and sexual harassment at work, and will not be retaliated against for speaking out against gender discrimination and harassment. Class Representatives are willing and able to represent the proposed class fairly and vigorously as they pursue their individual claims in this action. Class Representatives have retained counsel who are qualified, experienced and able to conduct this litigation, and to meet the time and fiscal demands required to litigate an employment discrimination class action of this size and complexity. The combined interests, experience and resources of Class Representatives and their counsel to litigate competently the individual and class claims at issue in this case clearly satisfy the adequacy of representation requirement of Fed.R.Civ.P. 23(a)(4).

### G.     Requirements of Rule 23(b)(2)

41.     Sanofi-Aventis has acted on grounds generally applicable to Class Representatives and the proposed class by adopting and following systemic policies, practices, and/or procedures that are discriminatory on the basis of gender.  Gender discrimination is Sanofi-Aventis's standard operating procedure rather than a sporadic occurrence.  Sanofi-Aventis has refused to act on grounds generally applicable to the class by, *inter alia*, refusing to adopt and apply selection, promotion, training, performance evaluation, compensation, and discipline policies, practices, and/or procedures that do not have a disparate impact on, or otherwise systemically discriminate against, female employees.  Sanofi-Aventis's systemic discrimination and refusal to act on grounds that are not discriminatory have made appropriate the requested final injunctive and declaratory relief with respect to the class as a whole.

42.     Injunctive and declaratory relief are the predominant relief sought in this case because they are the culmination of the proof of Sanofi-Aventis's individual and class-wide liability at the end of Stage I of a bifurcated trial. In addition, injunctive and declaratory relief are the essential predicate for Class Representatives' and class members' entitlement to monetary and non-monetary remedies at Stage II of such trial.  Declaratory and injunctive relief flow directly and automatically from proof of the common questions of law and fact regarding the existence of systemic gender discrimination against female employees at Sanofi-Aventis. Declaratory and injunctive relief are the factual and legal predicates for Class Representatives' and the class members' entitlement to monetary and non-monetary remedies for individual losses caused by, and for exemplary purposes necessitated by, such systemic discrimination.

**H.     Requirements of Rule 23(b)(3)**

43.     The common issues of fact and law affecting the claims of Class Representatives and proposed class members, including, but not limited to, the common issues identified in Subsection D above, predominate over any issues affecting only individual claims.

44.     A class action is superior to other available means for the fair and efficient adjudication of the claims of Class Representatives and members of the proposed class.

45.     The cost of proving Sanofi-Aventis's pattern and practice of discrimination makes it impracticable for Class Representatives and members of the proposed class to pursue their claims individually.

**VII.     ALLEGATIONS OF THE TITLE VII CLASS REPRESENTATIVES**

**A.     KAREN BELLIFEMINE**

<u>**Background**</u>

46.     **Class Representative Karen Bellifemine** ("Ms. Bellifemine") was hired by Sanofi-Aventis in approximately July 1995 as a Primary Care Sales Representative. Over the next twelve years, Ms. Bellifemine held a variety of positions at Sanofi-Aventis in New York and New Jersey. Ms. Bellifemine became a Senior Primary Care Sales Representative in approximately 1996. In approximately 1998, Ms. Bellifemine became a Hospital Representative, and in approximately 2003, Ms. Bellifemine became a Senior Cardiovascular Specialty Sales Representative. Ms. Bellifemine went on medical leave in approximately March 2006 and returned to her Senior Cardiovascular Specialty Sales Representative position in January 2007. During her tenure, Ms. Bellifemine has endured denials of promotion, disparate pay, differential treatment and a hostile work environment, sexual harassment, and retaliation. Ms. Bellifemine filed a Class-wide EEOC Charge of gender discrimination on or about March 8, 2006, in which

she complained about the gender discrimination she and other females have experienced at Sanofi-Aventis.

47.    Despite excellent performance, Ms. Bellifemine faced consistent denials of promotion. Ms. Bellifemine began receiving sales awards in February 1996, when she was awarded the Keftab Travel Award. The Keftab Travel Award was given to the top ten percent of the sales force for increasing the sales and market share of Keftab, a Sanofi-Aventis product. Ms. Bellifemine received a Regional Sales Award in February 2003, awarded to her for her position in the top ten percent of the entire U.S. sales force for all Sanofi-Aventis products sold in the 2002 calendar year. In February 2004, Ms. Bellifemine was named to the Winners Circle for placing in the top five percent of the U.S. sales force for the 2003 calendar year.

### Denials of Promotion

48.    In approximately mid-February or March of 2005, Ms. Bellifemine interviewed for a promotion as a Hospital Sales Representative to fill one of two open territories in Hackensack, New Jersey. In anticipation of receiving one of these positions, Ms. Bellifemine performed some of the responsibilities of the vacant positions in addition to her normal duties throughout April 2005. However, Ms. Bellifemine was discriminatorily denied the positions, which were both given to males. Ms. Bellifemine did not become aware that she had not been selected for the first position until approximately June of 2005 when a male, Dominick Miglizza began working in the territory. Moreover, she did not become aware that she had not been selected for the second position until approximately September 2005, when Daryl Macellaro began to work in the territory.

49.    On or about July 11, 2005 Ms. Bellifemine requested a transfer to another position. On or about July 12, the request was denied by the Regional Director Paul Spence.

50.    From October 2005 to December 2005, Ms. Bellifemine repeatedly contacted Sanofi-Aventis's Training Department and requested to participate in an in-house preceptorship training to become a sales trainer. The training forum, Sanofi City, enables experienced sales representatives to work with newly hired sales representatives in the corporate training facility in Bridgewater, New Jersey. Ms. Bellifemine's supervisor, District Manager Jeff Kotkin, strongly discouraged her from pursuing her interest in becoming a trainer. Manager Kotkin also directed Ms. Bellifemine not to contact anyone in the sales training department, telling her that any further contact would result in "serious consequences." Manager Kotkin also directed Ms. Bellifemine to copy him on any emails and voice mails she sent to Sanofi-Aventis employees.

51.    In approximately January of 2008, Ms. Bellifemine applied to a Plavix Marketing Manager position in the Plavix Marketing Department of Sanofi-Aventis. Ms. Bellifemine has a degree in marketing and extensive experience with the product, but she was ultimately rejected for the position in February 2008.

52.    As alleged herein, Ms. Bellifemine and the class of female representatives have been disparately impacted by Sanofi-Aventis's policy of requiring managerial approval to apply for promotions.

### Disparate Pay

53.    Ms. Bellifemine has been subjected to Sanofi-Aventis's practice of discriminatorily paying female employees unequal compensation.

54.    Upon information and belief, Ms. Bellifemine received a lower raise in 2005 than similarly situated male employees. Despite her exemplary sales record, Ms. Bellifemine's manager, Manager Kotkin, gave her only a three percent raise in salary in 2005. Ms. Bellifemine received notice of her low raise on or about May 15, 2005, when she received her Earning

Statement. Concurrently, Manager Kotkin gave two male employees, Keith LeSueur and Oscar Velez, higher raises of four percent. However, upon information and belief, Ms. Bellifemine's sales results were better than those of both male coworkers.

55.     In approximately May of 2006, Ms. Bellifemine was discriminatorily denied a pay increase altogether, despite good sales numbers and excellent relationships with her customers. Ms. Bellifemine's manager, Jeff Kotkin, discriminated against Ms. Bellifemine and failed to compensate her at the same level as less or equally qualified male employees.

56.     In 2007, Ms. Bellifemine was yet again denied a pay increase. Although Ms. Bellifemine had been out on disability for a portion of the 2006 sales year, she had obtained strong sales numbers for the rest of her employment period.

57.     Ms. Bellifemine was ranked #1 in her region for the sales year through the end of June 2007, and #3 in the region through the end of September 2007. Despite her numbers, Ms. Bellifemine was discriminatorily denied equal compensation.

**Differential Terms and Conditions of Employment**

58.     Ms. Bellifemine is held to a higher standard than male coworkers at Sanofi-Aventis. Upon information and belief, Ms. Bellifemine's managers discriminated against her in the terms and conditions of her employment by disciplining her more harshly than male employees.

59.     District Manager Jeff Kotkin's abusive behavior was acute on days when he and Ms. Bellifemine worked together one-on-one in a car, visiting various doctors' offices.

**B.    AMY ZEOLI**

Background

60.    **Class Representative Amy Zeoli** ("Ms. Zeoli") was hired by Sanofi-Aventis in approximately early 2001 as a Senior Sales Representative. Over the next five years, Ms. Zeoli continued to perform her duties as a Senior Sales Representative while also serving as a sales trainer and sitting on the Plavix Marketing Board and the Office Based Specialty Sales Board. Ms. Zeoli quit her employment with Sanofi-Aventis in approximately March 2006 when it became apparent that she would not receive the promotion to a managerial position that she desired.

61.    Despite outstanding performance, Ms. Zeoli faced consistent denials of promotion and pay. Ms. Zeoli began receiving sales awards almost from the moment she began her employment at Sanofi-Aventis, earning an expenses-paid vacation for placing within the top seven percent of sales representatives in her region in 2001, her very first year on the job. Ms. Zeoli went on to win the same award in 2002, 2003, and 2004. In addition, in 2002, Ms. Zeoli won her region's Rookie of the Year award as well as a Certificate of Excellence for her excellent sales numbers. By the end of her tenure at Sanofi-Aventis, Ms. Zeoli was training new sales representatives, a task demonstrative of her strong sales skills.

62.    In addition, Ms. Zeoli was selected to participate in a Management Development Program designed to train Sales Representatives for managerial positions. Participating Sales Representatives were guaranteed managerial job interviews upon completion of the Program with the understanding that they were preferred candidates. Despite completing the Program successfully, Ms. Zeoli was denied advancement to the managerial positions she had been

19

promised, while her male counterparts were deemed eligible for management positions well before having completed the Program.

63.     Sanofi-Aventis's policies of relying on managerial discretion and subjective decision-making prevented Ms. Zeoli from obtaining promotions and higher pay. Ms. Zeoli's District Manager, Steve Joseph, who was generally hostile toward women, blocked her from obtaining advancements. For example, during a field ride with Manager Joseph in approximately March of 2005, Ms. Zeoli inquired about the possibility of a merit increase based on her outstanding performance. Manager Joseph replied that Ms. Zeoli's husband was an attorney, and therefore "must make money."

## Denials of Promotion

64.     From May 12, 2005 through March of 2006, Ms. Zeoli was denied selection for promotions to management, despite the fact that she was guaranteed managerial job interviews based on her completion of the Management Development Program.

65.     Although Ms. Zeoli had excellent sales numbers, she was continually denied promotions into managerial positions to which she applied and for which she was well qualified. Specifically, Ms. Zeoli applied for a management position in Pennsylvania, and received notice that she had not been selected in approximately September of 2005. The position was given to a male, Michael Vecchiarelli, who had been with Sanofi-Aventis for less than 18 months. Additionally, Ms. Zeoli also applied to a management position in Westchester, and was denied the position in November 2005.

66.     Ms. Zeoli continued to apply for promotions until she left the company in March of 2006. She applied to two management positions in New Jersey and one in Connecticut in early 2006, but was denied both positions. Regional Sales Manager Holly May, the hiring manager for

20

the district manager position in the Sanofi-Aventis's Connecticut territory, informed Ms. Zeoli, contradicting company regulations, that because Ms. Zeoli resided in the state of Connecticut, she was disqualified from being a district manager in the state. However, the position was ultimately given to a resident of Connecticut. Ms. Zeoli was not allowed to interview of the position, although she had exceptional sales numbers and was the team trainer and was supported by her peers for the positions. Ms. Zeoli's District Sales Manager, Steve Joseph, refused to entertain the possibility of Ms. Zeoli interviewing for the position, despite her excellent qualifications and her Management Development Candidate status.

67.    On or about July 14 and 15, 2005, Ms. Zeoli, along with one other female and ten males, was selected to attend a session at the company's "Management Development Assessor Center" in Richmond, Virginia. During the program, Ms. Zeoli met with a psychological consultant hired by Sanofi-Aventis to help determine if potential applicants would make for effective managers. During her session, the consultant, Andrea Brown, told Ms. Zeoli that she was "too pretty and young" and therefore would not be taken seriously as a manager. The consultant's assessment of Ms. Zeoli's potential contradicted her excellent score on the program's tests.

68.    Shortly before Ms. Zeoli quit her employment at Sanofi-Aventis in approximately March 2006, her co-worker Sales Representative Hilary Jackson quit Sanofi-Aventis as well. Ms. Jackson later told Ms. Zeoli that one of the reasons she gave during her exit interview for leaving the company was Ms. Zeoli's failure to get promoted to a managerial position. Ms. Jackson alleged that she was disillusioned with the company after someone like Ms. Zeoli who had been in the management development program, was a sales trainer, took on additional roles and responsibilities and had good sales numbers did not get promoted.

**Disparate Pay**

69.    Upon information and belief, Ms. Zeoli has been subjected to Sanofi-Aventis's practice of discriminatorily denying equal compensation to female employees. Ms. Zeoli received a lower rate of pay than similarly situated male employees from May 12, 2005 until she left the company in March of 2006.

70.    In approximately March of 2006, Ms. Zeoli was denied the monetary compensation for an award she received. Ms. Zeoli was told by her supervisor Elizabeth Gainfield that she would receive the US Sales Champion award in recognition of her outstanding sales numbers for the year of 2005. However, Regional Sales Manager Holly May stated that Ms. Zeoli would not, in fact, receive the award. Ultimately, Ms. Zeoli received a plaque inscribed with her name and "2005 Sales Champion," but did not receive the accompanying monetary reward she was due.

71.    Ms. Zeoli began her employment at Sanofi-Aventis earning a salary of approximately $58,000 per year. At the time she left the company in approximately March 2006, after winning numerous sales awards and serving as a sales trainer in her district, Ms. Zeoli was earning a base salary of approximately $71,000 per year. However, upon information and belief, Sanofi-Aventis hired males with starting salaries greater than $80,000. In addition, several males were promoted to managerial positions within less than a year of their hire, even though company regulations stipulate that one must be employed by Sanofi-Aventis for a minimum of 18 months prior to being promoted to a managerial position  Thus, Ms. Zeoli was subjected to Sanofi-Aventis's discriminatory practice of selectively promoting men by creating a loophole to help favored male applicants circumvent the minimum 18-month requirement.

**Differential Terms and Conditions of Employment**

72.    Ms. Zeoli was subjected to different terms and conditions of employment, disciplined more harshly, and held to a higher standard than male coworkers by District Manager Steve Joseph. On more than one occasion Manager Joseph would post negative things about Ms. Zeoli on Cafepharma, an industry blog, in an effort to keep her from the management track. Ms. Zeoli's colleagues shared with her that he was responsible for the anonymous posts, and when Ms. Zeoli asked Manager Joseph about her suspicions and mentioned she was going to file a complaint against him, the posts stopped. After this incident, Ms. Zeoli's husband, an attorney, wrote a letter to Manager Joseph's superior, Regional Sales Manager Holly May, but Sanofi-Aventis took no action against him.

73.    In addition, as part of his job, Manager Joseph would make a number of sales calls a year with each representative in the district. Despite her excellent sales numbers and the fact that at this point Ms. Zeoli was in charge of training new sales representatives, Manager Joseph berated her throughout the ride-alongs, criticizing all of the sales tactics that had enabled Ms. Zeoli to be so successful. Manager Joseph berated Ms. Zeoli to the point that she would get physically ill. On several occasions, Ms. Zeoli experienced anxiety attacks and consulted with Dr. Mark Mankus who prescribed an anti-anxiety medication for Ms. Zeoli to take prior to her interactions with Manager Joseph.

C.    **MICHELLE POPA**

**Background**

74.    **Class Representative Michelle Popa ("Ms. Popa")** was hired by Sanofi-Aventis in approximately November 2003 as a Sales Representative in the East Fort Lauderdale district. From May 12, 2005 until she left the company, Ms. Popa endured denials of promotion and disparate pay. Ms. Popa quit her employment with Sanofi-Aventis in approximately January

23

2007 when it became apparent that she would not receive the promotion to a managerial position that she desired.

75.     Despite excellent performance, Ms. Popa faced consistent denials of promotions and equal pay.  When Ms. Popa was hired by Sanofi-Aventis in approximately November 2003, the sales representative whom she was replacing was ranked approximately 465 out of 500 nationally in his product line. Ms. Popa quickly proved integral in improving her traditionally underperforming district.   In 2005, Ms. Popa earned the "Jewelry Award" for placing in approximately the top 20 percent of sales representatives nationwide.  Ms. Popa shortly became a favorite of the physicians with whom she worked, once drawing approximately 65 doctors to a dinner program she ran.  Many of the physicians had her cell phone number and some of them wrote her letters of recommendation after she quit her employment at Sanofi-Aventis.   In addition to her outstanding sales numbers and her favorable relationships with many physicians, Ms. Popa held both a Bachelor's and a Master's degree.

## Denials of Promotion

76.     Despite Ms. Popa's excellent qualifications, she was continually denied promotional opportunities.

77.     For example, in approximately February 2006, Ms. Popa was selected for an interview for an open Hospital Sales Representative position in Raleigh-Durham, North Carolina.  Ms. Popa readied all of her application materials, but when she arrived at the interview, the hiring manager, a male, name unknown, was not there and never arrived to perform the interview.  Instead, without previously apologizing for having not attended the scheduled interview, the hiring manager telephoned Ms. Popa at home at around 7:00 in the

evening. He proceeded to conduct the interview while her children were in the background. Ms. Popa was later informed that, despite her qualifications, she was not selected for the position.

78. On another occasion, in approximately spring 2006, Ms Popa applied for an open Hospital Sales Representative position in the Fort Lauderdale area. Ms. Popa interviewed with District Manager Drew Diaz and then twice with Sales Representative Lisa Capinella, with whom Ms. Popa had previously worked. During these interviews, Ms. Capinella inappropriately asked Ms. Popa, the mother of five children, how her children would get to school and who would take care of them if she were given the Hospital Sales Representative position and the heightened responsibility that would come with it. Subsequent to her interviews with Ms. Capinella, Manager Diaz set up an 8:00 a.m. interview for Ms. Popa with the district manager in Orlando, a three-hour drive from Fort Lauderdale. Ms. Popa found this to be outrageous; a District Manager in Orlando would have no relationship with a Hospital Sales Representative in Fort Lauderdale. During the interview with the male Orlando District Manager, name unknown, he repeatedly insinuated that the promotion represented a big life change for Ms. Popa and that it would be hard on her family. Following the interview, Ms. Popa never heard back from anyone regarding whether she would be given the job.

79. On yet another occasion, in approximately summer 2006, Ms. Popa applied for an Office Based Specialty position in Fort Lauderdale. The day that the hiring manager, Carlos Diaz, called her regarding her application, Ms. Popa was taking a vacation day. Manager Diaz told Ms. Popa that she would have to come in to interview that very day, regardless of whether she was taking a vacation day. Ms. Popa went to the interview on short notice and was not given the job. Instead, the position was given to a male candidate from outside of her region, Sales Representative LeTerrance LNU, who had to relocate to begin the job. Ms. Popa would not have

had to relocate for the position, but was nevertheless not given the promotion for which she was well qualified. Ms. Popa later learned that LeTerrance was a close personal friend of the Regional Manager of the Fort Lauderdale territory, ReShay Abduhac.

80. Upon information and belief, Ms. Popa was subjected to Sanofi-Aventis's discriminatory practice of denying females equal compensation. From May 12, 2005 until she left the company in January 2007, Ms. Popa received a lower rate of pay than similarly situated male employees.

### Disparate Pay

81. From late May 2005 until she left the company in January 2007, Ms. Popa was earning a base salary of approximately $54,000 per year, while the males on her team were earning approximately $70,000. This pay discrepancy belied the fact that Ms. Popa had attained a Master's degree while most of her male co-workers had not.

82. Upon information and belief, in approximately late May of 2005, Ms. Popa received a discriminatorily low salary increase. Although Ms. Popa's sales numbers were excellent, she received a raise that was lower than that of similarly situated male colleagues.

83. In approximately June of 2006, Ms. Popa once again received a discriminatorily low pay increase, despite the fact that she had recently won the Jewelry award and had met all the expectations for her position. Ultimately, throughout the liability period, Ms. Popa was never given a raise of more than three percent, a grievance which she complained about to both Juan Ledesma and Chris Edwards, the two individuals who served as Ms. Popa's district managers during her tenure.

D.        NANCY BEANEY

## Background

84.       **Class Representative Nancy Beaney** ("Ms. Beaney") was hired by Sanofi-
Aventis in approximately April 1991 as a part-time Primary Care Sales Representative, and the
position became full-time in approximately July of 1996. Over the next eleven years, Ms.
Beaney held a variety of positions at Sanofi-Aventis in Texas. Ms. Beaney became a
Cardiovascular Sales Consultant in approximately August of 1997. In approximately September
of 1998, Ms. Beaney became a Senior Primary Care Sales Associate, and in approximately
December of 2000, she was promoted to an Executive Primary Care Sales Associate. In 2005,
Ms. Beaney transferred to a Senior Specialty CNS Sales Representative Position, and she
remains in that position. During her tenure, Ms. Beaney has endured denials of promotion,
disparate pay, differential treatment and a hostile work environment.

85.       Ms. Beaney has been the recipient of numerous awards while at Sanofi-Aventis,
including the Sanofi-Aventis Ring, given to the top 25% of the sales force, and the Sales
Associate of the Year award for 2003 and 2004. Ms. Beaney has been recognized not only for
her exceptional sales numbers, but also for her positive attitude and commitment to her team,
receiving several district accolades such as the Extra Mile Award, the Lightning Bolt of the
Quarter Award and the Meeting MVP award. Additionally, Ms. Beaney's interest in a
management role is well-established. She received the highest score and feedback in her region
for a Career Development Center seminar, which provided an independent assessment of a
management candidate's skills and suitability.

**Denials of Promotion**

86.    Despite interviewing for numerous management positions between May 12, 2005 and the present, Ms. Beaney has yet to be promoted to management.

87.    Although Ms. Beaney had stellar sales numbers, she was continually denied promotions into managerial positions to which she applied and for which she was well qualified. Specifically, in May of 2006, Ms. Beaney's former manager, Mike Cooper, approached her about a District Sales Manager ("DSM") vacancy in Dallas. However, when Ms. Beaney tried to discuss the position with her male manager, Regional Sales Director Tracy Dahms ("Director Dahms") informed her that he could not support her in her application.

88.    In approximately November of 2005, after Ms. Beaney had transferred from a primary care sales team to a CNS Specialty Position, she received a letter indicating that she had been reclassified as a Specialty Senior Sales Professional, and therefore lost her Executive Sales ranking, an effective demotion.

89.    Despite her exceptional performance in her position as a CNS representative, Ms. Beaney was not promoted back to the Executive Sales level. In 2006, Director Dahms specified the skills necessary for a sales level promotion in a "Bars Chart." Representatives who met the criteria would be promoted to the next sales level. Although Ms. Beaney met all the criteria, she did not receive the promotion.

90.    In July of 2006, Ms. Beaney interviewed with Hiring Manager Mike Doherty ("Manager Doherty") for the Dallas DSM position. From approximately August 2006 until approximately November 2006, Ms. Beaney served as the interim District Sales Manager for her district and anticipated that she would be selected for the permanent position. In August of 2006,

she interviewed with Area Vice President Mike Cahill for the Dallas DSM position. Ms. Beaney was told on a Friday in approximately August of 2006 that she would be promoted to the Dallas District Sales Manager position. The following Monday, she received the news that, due to a hiring freeze, the position could not be filled at the time. However, once the hiring freeze was lifted in November of 2006, Manager Doherty informed Ms. Beaney that she no longer had the District Sales Manager position. A male was being brought back from a West Texas District to fill the spot, despite the excellent reviews that Ms. Beaney received for her performance as interim DSM.

91.    In addition, in approximately January of 2007, Ms. Beaney received an email regarding an opening for a Dermik Aesthetics Regional Sales Manager position. The email stated that Sanofi-Aventis had a "strong desire to look at female and minority candidates." Ms. Beaney received an outstanding recommendation from Manager Doherty, who stated that he "wish[ed] she would wait until [Manager Doherty had] an opening, but she is too good to not consider now."

92.    Ms. Beaney completed the online application and e-mailed her resume to Human Resources Manager Lisa Craven on or about January 18, 2007. She received an automated e-mail response on or about January 21, 2007 indicating that she was not selected for the position, without an interview. In addition, she did not receive a response from Human Resources. The job was ultimately given to Reginald Gatewood, a male who left Plavix Marketing in the home office in New Jersey to take the position – yet another instance of Defendant's practice of hiring male candidates over equally qualified female candidates.

93.    In March of 2007, Ms. Beaney applied for a District Manager position with Sanofi-Pasteur, but did not receive any feedback regarding her status.

94.    In October of 2007, Ms. Beaney applied for an open Dallas District Sales Manager Position. She was once again rejected without an interview in approximately November of 2007, despite having been told on numerous occasions that she would be ideal for a District Sales Manager position and receiving nothing but positive feedback. The position was given to Sean Johnson, a male who transferred from West Texas.

### Disparate Pay

95.    Upon information and belief, Ms. Beaney was subjected to Sanofi-Aventis's practice of denying females equal compensation and received a lower rate of pay than similarly situated male counterparts from May 12, 2005 until the present.

96.    During her year-end review in May of 2006, Ms. Beaney met all the criteria for a promotion to the executive sales level, and her manager, John Bodnar ("Manager Bodnar") gave her the following rating: "outstanding, and an inline promotion to Executive Specialty Representative." However, Ms. Beaney did not receive a promotion in title or a promotional pay increase.

97.    In February of 2007, Ms. Beaney again asked management about returning to Executive level. She was told, however, that Executive level promotions are only for "career sales" professionals, and because Ms. Beaney had expressed an interest in Management, she was no longer eligible for an Executive level position, or the accompanying raise, despite having held such a title before.

98.    In September of 2007, during her mid-year review with Manager Bodnar, Ms. Beaney yet again discussed advancement to an executive sales level. Manager Bodnar stated that Director Dahms had made the decision that she would not be allowed to enter the Executive

sales level despite her qualifications. Even after Director Dahms subsequently left Sanofi-Aventis, there was no mention of any change in Ms. Beaney's title.

99.    Additionally, in June of 2007, Ms. Beaney received notice that her merit increase for her performance in 2006 was lower than similarly situated males. Ms. Beaney's "Outstanding" rating for the year of 2006 only secured her a 6% raise, the lowest possible increase for her rating category. Upon information and belief, male employees who received "Outstanding" ratings were awarded higher raises.

**E.    JENNIFER STORM**

<u>Background</u>

100.    **Class Representative Jennifer Storm** ("Ms. Storm") was hired by Sanofi-Aventis in approximately September 2003 as a Sales Representative in the Cleveland region. From May 12, 2005 until she left the company in July 2007, Ms. Storm endured denials of promotion and disparate pay.    Ms. Storm quit her employment with Sanofi-Aventis in approximately July 2007 when it became apparent that she would not receive the promotion to the senior position that she desired.

101.    Ms. Storm earned several awards as a sales representative, including the Top Primary Care Professional in her region for 2007, and was a member of the Plavix sales team ranked number one in the nation.    In addition, Ms. Storm met and often exceeded all her sales quotas, and received positive feedback from her regional manager.    Despite her excellent sales record, however, Ms. Storm was not considered for promotional opportunities, and constantly denied advancement in favor of male colleagues.

**Denials of Promotion**

102.    Despite her exceptional performance, Ms. Storm was denied promotions to better paying positions from May 12, 2005 until she left Sanofi-Aventis in July of 2007.

103.    For example, in early 2006, during the year-end review process for the 2005 sales year, Ms. Storm expressed an interest in a Senior Sales Representative position to her manager, Allan Krol ("Manager Krol"). Manager Krol then proceeded to give Ms. Storm a "below expectations" year-end review, completely disregarding her outstanding sales record and her past performance. The negative review caused Ms. Storm to be ineligible for the promotion, which was given to a male, Jim Swogger.

104.    Ms. Storm petitioned for a review of Manager Krol's evaluation. However, she never received feedback after her request, despite company policy stating that management must review evaluations in response to employee petitions.

105.    In addition, Ms. Storm was often discouraged from applying to positions by her male managers. When a District Trainer position opened in the spring of 2006, Ms. Storm expressed her interest to Manager Krol and asked about the application process. Manager Krol told her that she would have to write a letter to him, but not to bother because she would be wasting her time, since he would not consider her for the position. The position was eventually given to a male.

106.    In early 2007, Ms. Storm once again expressed interest in becoming a Senior Sales Representative, but was once again denied. Ms. Storm had received a positive review for the year of 2006, but she was not even considered for a promotion to the Senior Sales level. Todd Means, a male, was promoted instead. When she expressed her frustration to Regional

Manager Bill Dowell ("Manager Dowell"), she was informed that she would not be considered for the promotion because of the earlier negative review given by Manager Krol.

### Disparate Pay

107.    Upon information and belief, Ms. Storm was subjected to Sanofi-Aventis's discriminatory practice of denying females equal compensation. From May 12, 2005 until July 2007, Ms. Storm received a lower rate of pay than similarly situated male employees.

108.    Specifically, Todd Means, Ms. Storm's male partner, performed a job identical to Ms. Storm's, but earned a higher salary.

109.    In addition, Ms. Storm was discriminatorily denied a salary increase in early 2006. Because Manager Krol gave Ms. Storm a "below expectations" review for her year-end review, Ms. Storm did not receive an annual salary increase in 2006.

110.    Despite her strong performance and positive year-end review, Ms. Storm received a discriminatorily low pay increase in approximately June of 2007. Upon information and belief, Ms. Storm's raise was substantially lower than that of similarly situated male colleagues.

### Differential Terms and Conditions of Employment

111.    Ms. Storm was held to a higher standard than male coworkers at Sanofi-Aventis. Specifically, when Allan Krol became her District Manager in 2005, he immediately began to make discriminatory comments about her and subjected her to different terms and conditions of employment than male employees.

112.    During Ms. Storm's very first ride-along with Manager Krol, he told her he never would have hired her, and that she should have been a nurse instead of a Sales Representative. During subsequent sales rides, Manager Krol continued to criticize Ms. Storm's career choice,

even though her performance was excellent.    Ms. Storm was the only woman in a pod of four

sales representatives, and Manager Krol directed his comments solely to her.

## VIII.    CLASS ALLEGATIONS OF THE NEW YORK SUBCLASS

113.    Plaintiff Karen Bellifemine, brings claims for relief for violations of New York

Law as a class action, pursuant to Fed. R. Civ. P. 23, on behalf of herself and a subclass of

Sanofi-Aventis employees, defined as follows:

> All persons who are, were, or will be employed by Defendants as sales employees in
> New York State, or resided in New York state, at any time within the three years prior to
> the date of the filing of the Complaint.

114.    The New York Subclass is so numerous that joinder of all members, whether

otherwise required or permitted, is impracticable.    On information and belief, numerous

individuals were employed as sales employees in Defendant's various New York territories

during the relevant time period.

115.    There exist questions of law and fact common to the New York Subclass which

predominate over any questions affecting only individual members, including:

(a) whether Sanofi-Aventis has engaged in unlawful, systemic gender discrimination in

its compensation, pay, selection, promotion, advancement, transfer, training, discipline,

performance review, evaluation, territory assignment, tenure, pay scale and award policies,

practices, and/or procedures, and in the general terms and conditions of work and employment.

(b) whether Sanofi-Aventis is liable for a continuing systemic violation of New York

Law;

(c) whether, through its policies, practices, and/or procedures Sanofi-Aventis has denied or delayed the promotion of females in New York;

(d) whether, through its policies, practices, and/or procedures Sanofi-Aventis has precluded females in New York from eligibility for promotions by denying them training that male employees are afforded;

(e) whether, through its policies, practices, and/or procedures Sanofi-Aventis has paid females in New York less than comparable male employees; and

(f) whether, through its policies, practices, and/or procedures Sanofi-Aventis has engaged in a pattern and practice of failing to take prompt and effective action to remedy the gender discrimination in its New York workplace and has created a hostile work environment.

116.    Ms. Bellifemine's claims are typical of the claims of the New York Subclass. Like all Subclass members, Plaintiff Bellifemine is employed by Defendant and has been discriminated against on the basis of her gender.  Plaintiff Bellifemine suffers the same kind of harm as other Subclass members.

117.    Ms. Bellifemine's interests are co-extensive with those of the members of the class that she seeks to represent in this case.  Class Representative Bellifemine seeks to remedy Sanofi-Aventis's discriminatory employment policies, practices, and/or procedures. Ms. Bellifemine is willing and able to represent the proposed class fairly and vigorously as they pursue their individual claims in this action. Ms. Bellifemine has retained counsel who are qualified, experienced and able to conduct this litigation, and to meet the time and fiscal demands required to litigate an employment discrimination class action of this size and complexity.  The combined interests, experience, and resources of Class Representatives and

their counsel to litigate competently the individual and class claims at issue in this case clearly satisfy the adequacy of representation requirement of Fed.R.Civ.P. 23(a)(4).

## A. KAREN BELLIFEMINE'S NEW YORK CLAIMS

118.    Ms. Bellifemine incorporates by reference herein all of her factual allegations set forth in section VII (A) and in section IX (A). Additionally, Ms. Bellifemine alleges the following in support of her New York Executive Law § 296 claim:

119.    In approximately April of 2004, Ms. Bellifemine was denied a promotion to the executive sales level and the accompanying salary increase. Ms. Bellifemine received her year-end review in approximately April 2004. She had previously expressed an interest in obtaining a promotion to the executive sales level, and had recently won a national sales trip for her 2003 performance as one of the top 10% sales representatives in the country.  Additionally, Ms. Bellifemine had been promised that she would receive a promotion if she accomplished all her goals for the year.  However, despite the fact that she met all the goals set out for her and won a prestigious award, Ms. Bellifemine was denied the promotion by her new manager, Jeff Kotkin, who had not been Ms. Bellifemine's manager during the year for which she was being evaluated.

120.    While working in Hackensack, Ms. Bellifemine attained Winners Circle recognition, and she was instrumental in helping her territory achieve a high national ranking. However, instead of rewarding Ms. Bellifemine for her achievement, Sanofi-Aventis assigned Ms. Bellifemine's high-performing hospital territory to a male Sales Representative, Todd Mikolajczk, to groom him for a promotion.  Mr. Mikolajczk was promoted to the position of Metabolism Sales Manager in approximately January 2005, even though the sales ranking of the Hackensack territory had declined during his tenure.  Ms. Bellifemine has not been given the opportunity to become a manager.

121.    Additionally, Ms. Bellifemine was subjected to disparate terms and conditions of employment. Ms. Bellifemine's manager, Manager Kotkin was generally hostile towards women and harassed her. For example, in approximately January 2005, Manager Kotkin lost his temper and tried to force Ms. Bellifemine to admit to false accusations about her expense reports.

122.    Ms. Bellifemine and the New York class were discriminatorily subjected to disparate terms and conditions of employment, a hostile work environment and discrimination in promotions, pay, compensation, transfer, training, performance reviews, territory assignments, tenure, pay scale, awards, discipline, and other forms of discrimination on the basis of gender in violation of New York Executive Law § 296.

## IX.    INDIVIDUAL ALLEGATIONS OF THE PLAINTIFFS

### A.    KAREN BELLIFEMINE

#### Retaliation

123.    Defendant Sanofi-Aventis retaliated against Ms. Bellifemine by refusing to promote her or transfer her after she reported Manager Kotkin's gender discrimination and harassment.

124.    Ms. Bellifemine reported Manager Kotkin's wrongful conduct three times between June 2005 and February 2006 to Human Resources at Sanofi-Aventis. Because of Ms. Bellifemine's complaints to Human Resources, Manager Kotkin retaliated against her.

125.    On or about June 9 and 10, 2005, Ms. Bellifemine documented Manager Kotkin's inappropriate behavior in emails she sent to Kevin Phox in Human Resources. She then requested a transfer to another position. On or about July 11, 2005, the request was denied by the Regional Director Paul Spencer.

126.     In approximately December 2005, Manager Kotkin falsely accused Ms. Bellifemine of having poor relationships with certain customers and poor communication skills. On or about January 8, 2006, Ms. Bellifemine sent an email to Kevin Phox in Human Resources to report that Manager Kotkin had retaliated against her for reporting him to Human Resources several times. Ms. Bellifemine explained to Mr. Phox that Manager Kotkin had documented his accusations against her in a memo dated December 22, 2005. In addition to the false accusations concerning Ms. Bellifemine's job performance, Manager Kotkin's memo suggested Human Resources investigate his claims in what he termed a "360 evaluation" of Ms. Bellifemine.

127.     Because Ms. Bellifemine had filed a Human Resources complaint against him, Manager Kotkin prevented her from receiving a promotion to the position of sales trainer. From October 2005 to December 2005, Ms. Bellifemine repeatedly contacted Sanofi-Aventis's Training Department and requested to participate in an in-house preceptorship training to become a sales trainer. The training forum, Sanofi City, enables experienced sales representatives to work with newly hired sales representatives in the corporate training facility in Bridgewater, New Jersey. Ms. Bellifemine's supervisor, District Manager Jeff Kotkin, strongly discouraged her from pursuing her interest in becoming a trainer. Manager Kotkin also directed Ms. Bellifemine not to contact anyone in the sales training department, telling her that any further contact would result in "serious consequences." Manager Kotkin also directed Ms. Bellifemine to copy him on any emails and voice mails she sent to Sanofi-Aventis employees.

128.     On or about January 8, 2006, Ms. Bellifemine notified Human Resources and complained about Manager Kotkin for his harassing and hostile behavior toward her and other women. In her complaint to Human Resources, Ms. Bellifemine stated that Manager Kotkin was retaliating against her by falsely accusing her and by threatening to harm her reputation at work.

129.    Ms. Bellifemine took medical leave in approximately March 2006. From approximately June 2006 to approximately October 2006, Sanofi-Aventis Human Resources continued to harass Ms. Bellifemine, denying her disability. On October 1, 2006, Ms. Bellifemine was threatened with termination if she did not return to work, even though her doctor had stated that she was not physically ready.

130.    During Ms. Bellifemine's Workers' Compensation Hearing on January 9, 2007, Senior Director of Human Resources Kelly Byrne testified that Sanofi-Aventis maintained a "Green File" on Ms. Bellifemine. Included in this "Green File" are documents written by Manager Kotkin falsely accusing Ms. Bellifemine of having poor relationships with key Sanofi-Aventis physician-customers. On or about January 24, 2007, Ms. Bellifemine sent rebuttal letters to Ms. Byrne written by these same key physician-customers, demonstrating that Manager Kotkin's intent was to falsely document Ms. Bellifemine's performance, harass, and intimidate her. On numerous occasions Ms. Bellifemine requested Mr. Phox and Ms. Byrne to investigate false accusations generated by Manager Kotkin, but a proper investigation was never conducted by the Sanofi-Aventis Human Resources Department.

131.    Ms. Bellifemine incorporates by reference all other allegations relating to the terms and conditions of her employment in section VII (A).

**Hostile Work Environment and Sexual Harassment**

132.    Ms. Bellifemine endured a sexually charged work environment and was subjected to an ongoing pattern and practice of discrimination as well as a sexually hostile work environment by her managers and Defendant Sanofi-Aventis failed to take action to prevent such harassment.

133.    Ms. Bellifemine's Manager, District Sales Manager Jeff Kotkin was generally hostile towards women and harassed Ms. Bellifemine based on her gender. For example, in 2005, a sexually explicit email sent by Manager Kotkin quickly circulated around the division and was received by several employees, including Ms. Bellifemine and Wendy Schwartz. Manager Kotkin further acceded that the email originated in upper management. Ms. Schwartz brought the email to the attention of Human Resources in approximately June 2005, in conjunction with Ms. Bellifemine's complaints.

134.    The sexual harassment and hostile work environment was so pervasive that even male employees reported the conduct to Human Resources. Representative Scott Brick was disgusted by sexually explicit language used to describe his female coworkers. Mr. Brick contacted Sanofi-Aventis Human Resources after leaving the company in approximately June 2005 in support of the sexual harassment claims made by Ms. Bellifemine and two of her female coworkers.

135.    Ms. Bellifemine incorporates by reference all other allegations relating to the terms and conditions of her employment in section VII (A) and IX (A).

**B.    AMY ZEOLI**

### Hostile Work Environment and Sexual Harassment

136.    While at Sanofi-Aventis, Ms. Zeoli was subjected to sexual harassment from District Manager Steve Joseph. After Manager Joseph became district manager, he quickly fostered a sexually charged work atmosphere. Ms. Zeoli was the only female present on her team of eight sales representatives. During meetings, Ms. Zeoli's co-workers would habitually make lewd comments about Ms. Zeoli's breasts as well as other misogynistic slurs. Regardless

of the inappropriateness of the comments, Manager Joseph never reprimanded any of the males on Ms. Zeoli's team.

137.    In addition, at a company holiday party in approximately December 2005, Manager Joseph uttered sexist comments concerning Sales Representative Kristen Peake to several of her team members. Manager Joseph had harassed Ms. Peake, one of Ms. Zeoli's colleagues in her sales district, throughout her pregnancy that year. Ms. Zeoli spoke with Manager Joseph's superior, Regional Sales Manager Holly May, and told her of specific discriminatory incidents involving Manager Joseph. However, Ms. May told Ms. Zeoli that she "would not support" Ms. Zeoli if Ms. Zeoli brought these claims to Human Resources. The only change that came from Ms. Zeoli's conversation with Ms. May was that Manager Joseph never again went on a ride-along with Ms. Zeoli.

138.    Manager Joseph was generally hostile towards women and harassed Ms. Zeoli based on her gender. For example, in approximately January 2005, Ms. Zeoli was involved in a car accident and was forced to take disability leave to recuperate from her injuries. During her absence, Manager Joseph called Ms. Zeoli repeatedly on the telephone, telling Ms. Zeoli and her colleagues that he could give her job to someone else. The calls continued until a representative from Occupational Health informed Manager Joseph that he was not to call Ms. Zeoli during her medical leave.

139.    Ms. Zeoli incorporates by reference all other allegations relating to the terms and conditions of her employment in section VII (B).

C.    **JENNIFER STORM**

**Retaliation**

140.    Sanofi-Aventis retaliated against Ms. Storm by preventing her from obtaining promotions and advancement and by subjecting her to disparate terms and conditions of employment.

141.    Ms. Storm repeatedly called Human Resources in approximately March 2006 to complain about the hostile work environment she was enduring, and she asked that her complaints be kept private.  Ms. Storm was told by the human resources representative that if Manager Krol's behavior continued to be hostile, the company would consider it to be retaliatory.

142.    However, despite Ms. Storm's request for privacy, Human Resources contacted Ms. Storm's regional manager, who in turn informed Manager Krol of Ms. Storm's complaints.

143.    In the spring of 2006, Ms. Storm approached Manager Krol about applying to a District Trainer position, but Manager Krol told her not to bother because she would not get the position.

144.    In approximately June 2006, after Ms. Storm's complaint to Human Resources, Manager Krol scheduled a meeting with Ms. Storm. During the meeting, Manager Krol showed Ms. Storm a print-out of her call notes, and immediately began to accuse her of inaccurately reporting her call activity. Manager Krol's conduct was so abrasive that at the end of the meeting, Ms. Storm informed him she was not comfortable meeting him without a third party present.

145.    After the meeting, Ms. Storm told Regional Manager Bill Dowell about Manager Kroll's attitude. Despite Ms. Storm's complaint, Manager Kroll continued to threaten and criticize her.

146.    Ms. Storm incorporates by reference all other allegations relating to the terms and conditions of her employment in section VII (E).

## CLASS COUNTS

### COUNT I
### VIOLATIONS OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. § 2000, *et seq.*, AS AMENDED

### GENDER DISCRIMINATION

147.    Class Representatives re-allege and incorporate by reference each and every allegation contained in each and every aforementioned paragraph as though fully set forth herein.

148.    Sanofi-Aventis has discriminated against Class Representatives and all members of the proposed class by treating them differently from and less preferably than similarly situated male employees and by subjecting them to discriminatory denials of promotions, discriminatory denials of pay raises, discriminatory performance evaluations, discriminatory subjection to disciplinary procedures, disparate pay, disparate terms and conditions of employment, and other forms of discrimination in violation of Title VII.

149.    Sanofi-Aventis's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of Class Representatives and the members of the proposed class.

150.    As a direct and proximate result of Sanofi-Aventis's aforementioned conduct, Class Representatives and the members of the proposed class were damaged and suffered economic losses, mental and emotional harm, anguish, and humiliation.

151. Sanofi-Aventis's policies, practices, and/or procedures have produced a disparate impact against Class Representatives and the class members with respect to their terms and conditions of employment.

152. By reason of the continuous nature of Sanofi-Aventis's discriminatory conduct, persistent throughout the employment of Class Representatives and class members, Class Representatives and class members are entitled to application of the continuing violation doctrine to all of the violations alleged herein.

153. By reason of the discrimination suffered at Sanofi-Aventis, Class Representatives and the members of the proposed class are entitled to all legal and equitable remedies available under Title VII.

**COUNT II**
**VIOLATIONS OF N.Y. EXEC. LAW § 296**

**GENDER DISCRIMINATION**
**(On Behalf of Plaintiff Bellifemine and the New York Subclass)**

154. Class Representative Karen Bellifemine and the proposed New York Subclass ("NY Subclass") re-allege and incorporate by reference each and every allegation contained in each and every aforementioned paragraph as though fully set forth herein.

155. Because of their gender, Sanofi-Aventis discriminated against Ms. Bellifemine and the members of the proposed NY Subclass in compensation or in the terms, conditions, or privileges of their employment, in violation of New York Executive Law § 296.

156. Because of their gender, Sanofi-Aventis also denied or withheld from Ms. Bellifemine and the members of the proposed NY Subclass their right to be admitted to or participate in an on-the-job training program, executive training program and/or management training program in violation of New York Executive Law § 296.

44

157.   Sanofi-Aventis further discriminated against Ms. Bellifemine and the members of the proposed NY Subclass in their pursuit of such programs and discriminated against them in the terms, conditions or privileges of such programs because of gender, in violation of New York Executive Law § 296.

158.   As a direct and proximate result of Sanofi-Aventis's aforementioned conduct, Ms. Bellifemine and the members of the proposed NY Subclass were damaged and suffered economic losses, mental and emotional harm, anguish, and humiliation.

159.   By reason of the continuous nature of Sanofi-Aventis's discriminatory conduct, persistent throughout the employment of Ms. Bellifemine and class members, Ms. Bellifemine and the members of the proposed NY Subclass are entitled to application of the continuing violation doctrine to all of the violations alleged herein.

160.   By reason of the gender discrimination suffered at Sanofi-Aventis, Ms. Bellifemine and the members of the proposed NY Subclass are entitled to all legal and equitable remedies available under New York Executive Law § 296.

## INDIVIDUAL COUNTS

### COUNT III
### VIOLATIONS OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. § 2000E-3

### RETALIATION
### (On Behalf of Named Plaintiff Bellifemine)

161.   Ms. Bellifemine re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as though fully set forth herein.

162.   Ms. Bellifemine's EEOC charge includes a complaint of retaliation against Sanofi-Aventis.

45

163.    Sanofi-Aventis retaliated against Ms. Bellifemine because she insisted upon a work environment free of gender discrimination and because she complained about gender discrimination by subjecting her to adverse employment actions, including but not limited to, disparate terms and conditions of employment in violation of Title VII § 2000E-3.

164.    Sanofi-Aventis's actions were intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of causing harm to Ms. Bellifemine.

165.    As a direct and proximate result of Sanofi-Aventis's aforementioned conduct, Ms. Bellifemine was damaged and suffered economic losses, mental and emotional harm, anguish, and humiliation.

166.    By reason of the retaliation suffered at Sanofi-Aventis, Ms. Bellifemine is entitled to all legal and equitable remedies available under Title VII § 2000E-3.

## COUNT IV
## VIOLATIONS OF N.Y. EXEC. LAW § 296

### RETALIATION
### (On Behalf of Named Plaintiff Bellifemine)

167.    Ms. Bellifemine re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as though fully set forth herein.

168.    Ms. Bellifemine's EEOC charge includes a complaint of retaliation against Sanofi-Aventis.

169.    Sanofi-Aventis retaliated against Ms. Bellifemine because she insisted upon a work environment free of gender discrimination and because she complained about gender discrimination by subjecting her to adverse employment actions, including but not limited to, disparate terms and conditions of employment in violation of New York Executive Law § 296.

170.    Sanofi-Aventis's actions were intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of causing harm to Ms. Bellifemine.

171.    As a direct and proximate result of Sanofi-Aventis's aforementioned conduct, Ms. Bellifemine was damaged and suffered economic losses, mental and emotional harm, anguish, and humiliation.

172.    By reason of the retaliation suffered at Sanofi-Aventis, Ms. Bellifemine is entitled to all legal and equitable remedies available under New York Executive Law § 296.

## COUNT V
### VIOLATIONS OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. § 2000E-3

### SEXUAL HARASSMENT
#### (On Behalf of Named Plaintiff Bellifemine)

173.    Ms. Bellifemine re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as though fully set forth herein.

174.    Ms. Bellifemine's EEOC charge includes a complaint of sexual harassment against Sanofi-Aventis.

175.    Ms. Bellifemine endured a sexually charged work environment and was subjected to an ongoing pattern and practice of discrimination as well as a sexually hostile work environment by her managers, and Defendant Sanofi-Aventis failed to take action to prevent such harassment.

176.    Sanofi-Aventis's actions were intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of causing harm to Ms. Bellifemine.

177.    As a direct and proximate result of Sanofi-Aventis's aforementioned conduct, Ms. Bellifemine was damaged and suffered economic losses, mental and emotional harm, anguish, and humiliation.

178.    By reason of the sexual harassment suffered at Sanofi-Aventis, Ms. Bellifemine is entitled to all legal and equitable remedies available under Title VII § 2000E-3.

**COUNT VI**
**VIOLATIONS OF N.Y. EXEC. LAW § 296**

**SEXUAL HARASSMENT**
**(On Behalf of Named Plaintiff Bellifemine)**

179.    Ms. Bellifemine re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as though fully set forth herein.

180.    Ms. Bellifemine's EEOC charge includes a complaint of sexual harassment against Sanofi-Aventis.

181.    Ms. Bellifemine endured a sexually charged work environment and was subjected to an ongoing pattern and practice of discrimination as well as a sexually hostile work environment by her managers, and Defendant Sanofi-Aventis failed to take action to prevent such harassment.

182.    Sanofi-Aventis's actions were intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of causing harm to Ms. Bellifemine.

183.    As a direct and proximate result of Sanofi-Aventis's aforementioned conduct, Ms. Bellifemine was damaged and suffered economic losses, mental and emotional harm, anguish, and humiliation.

184.    By reason of the sexual harassment suffered at Sanofi-Aventis, Ms. Bellifemine is entitled to all legal and equitable remedies available under New York Exec. Law § 296

## COUNT VII
## VIOLATIONS OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. § 2000E-3

### SEXUAL HARASSMENT
### (On Behalf of Named Plaintiff Zeoli)

185.    Ms. Zeoli re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as though fully set forth herein.

186.    Ms. Zeoli endured a sexually charged work environment and was subjected to an ongoing pattern and practice of discrimination as well as a sexually hostile work environment by her managers, and Defendant Sanofi-Aventis failed to take action to prevent such harassment.

187.    Sanofi-Aventis's actions were intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of causing harm to Ms. Zeoli.

188.    As a direct and proximate result of Sanofi-Aventis's aforementioned conduct, Ms. Zeoli was damaged and suffered economic losses, mental and emotional harm, anguish, and humiliation.

189.    By reason of the sexual harassment suffered at Sanofi-Aventis, Ms. Zeoli is entitled to all legal and equitable remedies available under Title VII § 2000E-3.

## COUNT VIII
## VIOLATIONS OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. § 2000E-3

### RETALIATION
### (On Behalf of Named Plaintiff Storm)

190.    Ms. Storm re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as though fully set forth herein.

191.    Sanofi-Aventis retaliated against Ms. Storm because she insisted upon a work environment free of gender discrimination and because she complained about gender discrimination. Sanofi-Aventis subjected Ms. Storm to adverse employment actions, including but not limited to, denials of promotion and disparate terms and conditions of employment in violation of Title VII § 2000E-3.

192.    Sanofi-Aventis's actions were intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of causing harm to Ms. Storm.

193.    As a direct and proximate result of Sanofi-Aventis's aforementioned conduct, Ms. Storm was damaged and suffered economic losses, mental and emotional harm, anguish, and humiliation.

194.    By reason of the retaliation suffered at Sanofi-Aventis, Ms. Storm is entitled to all legal and equitable remedies available under Title VII § 2000E-3.

### PRAYER FOR RELIEF

WHEREFORE, Class Representatives, on behalf of themselves and the members of the class whom they seek to represent, request the following relief:

A.    Certification of the case as a class action maintainable under Federal Rules of Civil Procedure Rule 23 (a), (b)(2), and/or (b)(3), on behalf of the proposed plaintiff class, and

designation of the Plaintiffs as representatives of this class and their counsel of record as class counsel;

B.    Declaratory judgment that Sanofi-Aventis's employment policies, practices, and/or procedures challenged herein are illegal and in violation of Title VII;

C.    A permanent injunction against Sanofi-Aventis and its partners, officers, owners, agents, successors, employees, and/or representatives, and any and all persons acting in concert with them, from engaging in any further unlawful practices, policies, customs, usages, and gender discrimination by the Defendant as set forth herein;

D.    An Order requiring Sanofi-Aventis to initiate and implement programs that (i) will provide equal employment opportunities for female employees; (ii) will remedy the effects of the Defendant's past and present unlawful employment policies, practices and/or procedures; and (iii) will eliminate the continuing effects of the discriminatory and retaliatory practices described above;

E.    An Order requiring Sanofi-Aventis to initiate and implement systems of assigning, training, transferring, compensating and promoting female employees in a non-discriminatory manner;

F.    An Order establishing a task force on equality and fairness to determine the effectiveness of the programs described in (D) and (E) above, which would provide for (i) monitoring, reporting, and retaining of jurisdiction to ensure equal employment opportunity; (ii) the assurance that injunctive relief is properly implemented; and (iii) a quarterly report setting forth information relevant to the determination of the effectiveness of the programs described in (D) and (E) above;

G.      An Order placing or restoring Plaintiffs and the class members into those jobs they would now be occupying but for Sanofi-Aventis's discriminatory policies, practices, and/or procedures;

H.      An Order directing Sanofi-Aventis to adjust the wage rates and benefits for Plaintiffs and the class members to the level that they would be enjoying but for the Defendant's discriminatory policies, practices, and/or procedures;

I.      An award of back pay, front pay, lost benefits, preferential rights to jobs and other damages for lost compensation and job benefits suffered by Plaintiffs and the class members to be determined at trial;

J.      Any other appropriate equitable relief to which Plaintiffs and proposed class members are entitled;

K.      An award of compensatory, nominal, and punitive damages to Class Representatives and the class in an amount not less than 300 million dollars;

L.      An award of litigation costs and expenses, including reasonable attorneys' fees, to Plaintiffs and class members;

M.      Pre-judgment interest;

N.      Post-judgment interest;

O.      Such other and further relief as the Court may deem just and proper; and

P.      Retention of jurisdiction by the Court until such time as the Court is satisfied that the Defendant has remedied the practices, policies, and/or procedures complained of herein and is determined to be in full compliance with the law.

**DEMAND FOR JURY**

Plaintiffs demand trial by jury of all issues triable of right to a jury.

Respectfully submitted this 17th of April, 2008:

_____

David Sanford, D.C. Bar No. 457933
dsanford@nydclaw.com
Meenoo Chahbazi, CA Bar No. 233985
mchahbazi@nydclaw.com
**SANFORD WITTELS & HEISLER, LLP**
1666 Connecticut Ave. NW
Suite 310
Washington, D.C. 20009
Telephone: (202) 742-7780
Facsimile:  (202) 742-7776
dsanford@nydclaw.com

Steven Wittels, (SLW-8110)
swittels@nydclaw.com
Jeremy Heisler, (JH-0145)
jheisler@nydclaw.com
**SANFORD WITTELS & HEISLER, LLP**
950 Third Avenue
10th Floor
New York, NY 10022
Telephone: (646) 456-5695
Facsimile: (646) 723-2948

Grant Morris, D.C. Bar No. 926253
grantemorris@gmail.com
**LAW OFFICES OF GRANT E. MORRIS**
1666 Connecticut Ave. NW
Suite 310
Washington, D.C. 20009
Telephone: (202) 742-7783
Facsimile:  (202) 742-7776

*Attorneys for Plaintiffs*